STATE OF CONNECTICUT *v.* MARTIN GEISLER
(6934)

DUPONT, C. J., BORDEN, SPALLONE, DALY, O'CONNELL, NORCOTT, FOTI and LAVERY, Js.

Argued February 14—decision released May 11, 1990

*Richard Emanuel,* for the appellant (defendant).

*Leon F. Dalbec, Jr.,* deputy assistant state's attorney, with whom, on the brief, were *Eugene Callahan,* state's attorney, and *Warren Murray,* assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant was charged, by substitute information, with operating a motor vehicle while under the influence of liquor in violation of General Statutes § 14-227a (a) (2), assault in the second degree with a motor vehicle in violation of General Statutes § 53a-60d and evading responsibility in violation of General Statutes § 14-224 (a). The prosecution arose out of a motor vehicle accident involving the defendant's automobile and a motorcycle. After a jury trial, the defendant was found guilty on all three counts. The defendant appeals only from the judgment of conviction of operating while under the influence of liquor and assault in the second degree with a motor vehicle; he does not appeal from the judgment of his conviction for evading responsibility.

The defendant claims (1) that the trial court should not have denied his motion to suppress evidence obtained after a warrantless arrest, (2) that the evidence was insufficient to establish the defendant's guilt under General Statutes §§ 14-227a (a) (2) and 53a-60d, and (3) that the court erred in its instructions to the jury on General Statutes §§ 14-227a (a), 53a-60d and 14-242. We reverse the trial court's judgment.

I

THE MOTION TO SUPPRESS

The narrow issue regarding the defendant's first claim is whether the so called "emergency doctrine" justified the warrantless entry into the defendant's home. The following evidence was adduced at the hearing on the motion to suppress. On July 24, 1986, at approximately 3 p.m., the victim, Mark Brunstad, was operating a motorcycle westbound on Long Lots Road in Westport. At the intersection of Long Lots Road and Bayberry Lane, the victim was involved in an accident with a red Peugeot station wagon that was travelling east on Long Lots Road; the victim was injured in the accident.

After the accident, the victim observed the red Peugeot leave the scene, heading north on Bayberry Lane. When the police arrived, the victim gave them a description of both the vehicle that hit him and the driver of that vehicle. The victim described the driver of the Peugeot as an older man with gray hair and glasses. He gave no indication that the driver was injured or appeared intoxicated. He stated only that the driver stopped, looked back at him, and then drove away.

When Officer Michael Barrett of the Westport police department arrived at the accident scene, he observed an overturned motorcycle and the victim being attended to by emergency personnel. He further observed glass debris, a piece of trim and the front grille of a Peugeot. Sergeant Leonard Rummo of the Westport police department told Barrett that the victim had been hit by a red Peugeot station wagon that had fled the scene of the accident.

After assisting in traffic control for approximately twenty minutes, Barrett was dispatched to check driveways on Bayberry Lane in an attempt to locate a vehicle matching the description given by the victim. Approximately one mile from the accident scene, in a driveway adjacent to a house on Bayberry Lane, Barrett observed a red Peugeot station wagon. He ran a check on the vehicle's registration and was advised that the vehicle was registered under the name of Geisler at that address.

The Peugeot was parked in the driveway with its door ajar and the keys in the ignition. The left front fender of the vehicle was dented, it was missing a piece of trim, the left headlight was broken, the plastic front grille was missing and hair fibers were observed on the front fender.

Officer Gordon Hiltz of the Westport police department, who had also been dispatched to check driveways in the area, shortly thereafter, arrived at the Bayberry Lane home to assist Barrett. Upon his arrival, he noted that the Peugeot's radiator was warm, consistent with its having been recently operated.

Observing no one in the area, the officers circled the house and then approached the front door of the residence. The inner front door was open, but the outer screen door was closed. The officers rang the doorbell, knocked on the door, and shouted through the screen door. They received no response from anyone in the house, and they again walked around the perimeter of the residence, knocking on the windows in an attempt to arouse someone, if someone should happen to be in the house. They still received no response. Thereafter, the officers returned to the front door and again knocked on the door and yelled into the house. Again, they received no response.

At this point, the officers discussed the possibility that the operator of the Peugeot may have been injured and might be in need of assistance. They subsequently made a warrantless entry into the defendant's home.[1]

At about 3:30 p.m., Barrett and Hiltz opened the closed screen door and entered the house "at the same time" and "for the same purported reason" — the possible injuries sustained by the operator of the Peugeot. They entered the kitchen, and yelled out "Anyone home?" but received no response. After walking into

---

[1] It is significant to note that Officers Barrett and Hiltz testified that the factors that influenced their decision to enter the home were (1) the damage to the Peugeot which they thought was sufficient to cause injury to the driver, (2) the description of the driver as an "older" man, (3) their belief that the driver had been rendered unconscious or had suffered a heart attack as a result of the accident, and (4) their "collective experience" as police officers.

the house, from their vantage point in the kitchen, they could see across a hallway into a bedroom, where someone was lying on the bed. They again called out, but received no response. They then entered the bedroom, where they found the defendant, fully clothed, apparently either asleep or unconscious on the bed. There was an odor of alcohol in the bedroom.

The officers then shook the defendant to wake him up in order "to see if he was all right." The defendant awoke, they asked him if he was all right, and he replied that he was. The defendant had no visible injuries, nor did he complain of any, and the officers determined that he was not injured from the accident.

While still in the bedroom, Barrett, who was in uniform, asked the defendant if he had been drinking, and the defendant responded "Yes." In response to Barrett's further questioning, the defendant conceded that the red Peugeot outside was his and that he had been operating it. Barrett then asked the defendant when he had operated the Peugeot, and the defendant answered "I got home about an hour ago." All of these questions were asked in the bedroom, before the defendant had been advised of his *Miranda*[2] rights.

Barrett and Hiltz then asked the defendant to accompany them outside, and the defendant complied. Once outside, Barrett asked the defendant if the red Peugeot was the car he had been driving, and the defendant answered in the affirmative. The defendant was then asked if he was involved in an accident, and if he was driving the car when the damage occurred. The defendant responded in the negative. At that point, Barrett placed the defendant under arrest, handcuffed him, placed him in a patrol car, and advised him of his rights.

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## A

### THE TRIAL COURT'S RULING

Prior to the trial court's ruling on the defendant's motion to suppress, the parties, at the urging of the trial court, stipulated to the following: (1) probable cause existed for the defendant's arrest at the time of the warrantless entry and (2) the defendant was arrested inside his home by police who entered without a warrant.[3] The trial court found that "exigent circumstances" existed to justify the warrantless entry by the police. The exigent circumstances found by the court were the officers' "reasonable belief" that the defendant's "life was endangered," that the defendant might attempt to flee, and the danger of destruction of evidence. The court further concluded that even if the police did not have exigent circumstances to enter the house, the blood alcohol results, the videotape of the defendant's arrest, and the defendant's statements to the police were not the "fruit of an illegal arrest" and were, therefore, admissible.

We first note that the state has conceded in its brief, and we agree, that there is no support for the court's findings regarding the risks of destruction of evidence and the defendant's flight, and that such findings cannot be justified on appeal. We, therefore, need address only the issue of whether the police officers reasonably believed that the defendant's life was in danger. Although the court, in its ruling, relied on the case of *State* v. *Harris,* 19 Conn. App. 174, 561 A.2d 459, cert. denied, 212 Conn. 814, 565 A.2d 537 (1989), in which this court set forth the standards for "exigent circumstances," we agree with the parties to this appeal

---

[3] At the suppression hearing, Barrett conceded that the defendant would not have been allowed to leave the officers' presence had he made such an attempt.

that the court confused "exigent circumstances" with the "emergency doctrine" in concluding that the warrantless entry was justified.

### B

#### THE EMERGENCY DOCTRINE

It is fundamental that " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . .' " *Payton* v. *New York,* 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), quoting *United States* v. *United States District Court,* 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972); see also *State* v. *Gallagher,* 191 Conn. 433, 443, 465 A.2d 323 (1983). Warrantless searches and seizures inside a home are presumptively unreasonable; see *Payton* v. *New York,* supra, 586; and the state bears the burden of showing that "exigent circumstances" exist to justify the entry into a private home for the purpose of conducting a search or effecting an arrest without a warrant. *State* v. *Klauss,* 19 Conn. App. 296, 300, 562 A.2d 558 (1989); *State* v. *Enright,* 17 Conn. App. 142, 147, 550 A.2d 1095 (1988).

The "emergency doctrine" is well established in the law of search and seizure. See *Mincey* v. *Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *State* v. *Klauss,* supra; 2 W. LaFave, Search and Seizure (2d Ed. 1974) § 6.6 (a), pp. 697–702. Pursuant to this doctrine, police may enter a home without a warrant only "when they reasonably believe that a person within is in need of *immediate* aid." (Emphasis added.) *State* v. *Klauss,* supra, 301. "[G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Good* v. *Dauphin County Social Services,* 891 F.2d 1087, 1094 (3d Cir. 1989). The reasonableness of a police officer's deter-

mination that an emergency exists is evaluated on the basis of facts known *at the time of entry*. See W. LaFave, supra, 698. The test is an objective one. See *State* v. *Guertin*, 190 Conn. 440, 453, 461 A.2d 963 (1983).

This court recently described the test to be employed in "emergency doctrine" cases as "whether, under the totality of the circumstances, a well-trained police officer reasonably would have believed that a warrantless entry was necessary to assist a person inside in need of *immediate* aid." (Emphasis added.) *State* v. *Klauss*, supra, 302. After a thorough review of this entire trial record, we conclude that the trial court's finding of a justifiable warrantless entry into the defendant's home cannot be supported by the "emergency doctrine."

In support of our conclusion, we specifically note that Barrett and Hiltz conceded that, aside from the possibility of injury, there existed no other emergency circumstance for a warrantless entry. "[T]here is a significant difference between a police entry for the purpose of making an arrest or searching for evidence incident to a criminal investigation and an entry for purposes of rendering aid or saving human life." Id., 301.

Hiltz testified that, on the basis of his eleven years' experience of investigating motor vehicle accidents, he felt he would have been "negligent" if he did not go into the defendant's home to determine whether the defendant was injured. In support of Hiltz's belief that the defendant was possibly injured and, in accordance with the standards of the "emergency doctrine," in need of *immediate* aid, Hiltz testified that he had seen many motor vehicle accidents "where people have sustained an injury without any physical evidence at the site of injury, at the mechanism of injury." Hiltz's belief, however, is not supported by the evidence and, accordingly, does not comport with the reasonable

actions of a well trained officer under the totality of the circumstances of the present case.

"Since the [emergency] doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception." W. LaFave, supra, § 6.6 (a), p. 698; see also *Mincey* v. *Arizona,* supra, 390–91. The present case requires us to question whether there was any evidence to support a reasonable belief that an emergency existed, or, more specifically, that the defendant was in need of immediate assistance.

This case is unique in that it differs factually from the great majority of the "emergency doctrine" cases that involve common emergency situations (e.g., gunfire, fumes, smoke, explosion, screams, or bloody trails leading into a home). See W. LaFave, supra, for a litany of such cases; see also *Wayne* v. *United States,* 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J., concurring). The case of *Lambert* v. *State,* 745 P.2d 1185 (Okl. Crim. App. 1987), although coming as factually close to the present case as any, is illustrative of that difference. In *Lambert,* the Oklahoma Court of Criminal Appeals held that the entry by police officers into the residence of a suspected drunken driver *known* to have been injured and to have been the driver of a "severely damaged," "wrecked" vehicle was not justified by the concern for that person's injuries, as the person had responded to the officer's inquiries made from without the home that he was all right. *Lambert* is silent as to whether, had the officer received no response, his warrantless entry would have been justified.

Here, however, we are faced with a fact situation that is an extension of *Lambert*. While the officers here received no response to their inquiries, there was nei-

ther evidence of a severely damaged vehicle[4] nor of an injured driver.[5] At the outset, the investigating officers were armed only with the description of the driver as an "older" man who had fled the scene of the accident after stopping for a moment to look back at the point of collision with the motorcyclist. The victim provided no information supporting the belief that the driver was injured and in need of assistance. Added to this knowledge were the observations of the police at the defendant's home, namely, the car with the door ajar and the keys in the ignition and the inner door of the house open with the outer screen door shut on a July afternoon. Nothing from these facts could be reasonably said to provide a basis for believing that the driver was injured to the point of needing immediate aid.

There are no cases that directly guide us in the application of the "emergency doctrine" standards under circumstances such as those present here. Persuasive, however, are certain precepts regarding the "emergency doctrine" that are applicable to this case.

It is clear that the officers had no actual evidence to support their conclusion of serious injury to the defendant, whom the officers had never seen before their entry, but whom they assumed to be the driver of the red Peugeot, within the house and, according to their testimony, in need of immediate medical assistance. Compare *Thompson* v. *McManus,* 512 F.2d 769 (8th Cir.), cert. denied, 421 U.S. 1014, 95 S. Ct. 2421, 44 L. Ed. 2d 683 (1975) (police justified in entering home

[4] The evidence, including the photographs entered as exhibits, fails to indicate that the damage was severe.

[5] We also note that the police officer's documented report of the incident included no reference whatsoever to injuries or even possible injuries to the driver of the Peugeot. Further, the officers did not express concern that the driver might be injured and in need of immediate assistance until outside the defendant's home.

of woman assaulted in that home and who had struggled to the home of a neighbor, who called the police because there might be others injured inside); *State* v. *Barone,* 330 F.2d 543, 544 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S. Ct. 1940, 12 L. Ed. 2d 1053 (1964) (entry justified where police heard screams in the middle of the night coming from within the home); *People* v. *Kepi,* 65 Ill. App. 3d 327, 382 N.E.2d 642 (1978) (apartment door wide open at 2 a.m. and blood stains on floor justified belief that someone might be in need of immediate aid); *Duquette* v. *Godbout,* 471 A.2d 1359 (1984) (entry proper when police found distraught mother screaming and banging on apartment door, saying she believed her daughter was inside and that she had heard screaming within); see also cases cited in W. LaFave, supra, n.23–33. The evidence in this case does not justify a reasonable belief that the defendant's medical condition manifested itself in such a traumatic fashion (e.g., heart attack, stroke, serious internal injuries) as would require the officers' immediate entry into the home.

The objective test that we formulated in *State* v. *Klauss,* supra, focuses on the belief of a reasonable, well trained police officer that, under the totality of the circumstances, the person inside the home is in need of immediate aid. *Klauss* provides a factual situation that clearly warrants application of the "emergency doctrine." In *Klauss,* the police had received information from several sources, including the defendant's girl friend, that the defendant was despondent, intoxicated, armed with either a shotgun or handgun, and possibly suicidal. They had information that a "gunshot had either been fired or that a shotgun had been activated by a pumping action." Id., 303. The defendant's housemates told the officers that they had seen the defendant leave the house but that " '[h]e could have come back by the time we went to the police station and

back.' " On the basis of all of this information, the police immediately set out in search of the defendant. On the basis of the totality of these circumstances, the trial court held, and this court affirmed, that the "emergency doctrine" justified entry because the police reasonably believed the defendant was in *immediate* need of aid, that the only purpose in entering the apartment was to protect the defendant and third parties, and that the defendant, believed to be armed and suicidal, had not yet been located and that it was reasonable to believe that he might be in the apartment. Id., 302–303.

The circumstances of the present case, however, do not justify a finding that such a reasonable belief existed. In employing an exception to a constitutional requirement such as the "emergency doctrine," courts should not become mindless automatons that afford the judicial stamp of approval to each and every claim of emergency. "[T]he exception must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, an *imminent* and substantial threat to life, health or property—the constitutionally guaranteed right to privacy must prevail." (Emphasis added.) *People* v. *Smith,* 7 Cal. 3d 282, 286, 101 Cal. Rptr. 393, 496 P.2d 1261 (1972); see also *Good* v. *Dauphin County Social Services,* supra, 1094. If we were to sanction the application of the emergency doctrine in this case, we would create a precedent that could be misinterpreted by law enforcement authorities as a more expansive ticket of entry into a person's private home than the emergency doctrine, in fact, permits.

We do not adopt a "bright line" test for cases such as these, but here we conclude that this case does not provide sufficient factual circumstances meriting the application of the emergency doctrine. We acknowledge that "salutary and empirical doctrine of an emergency

or exigency making reasonable a warrantless entry . . ."; *Root* v. *Gauper,* 438 F.2d 361, 365 (8th Cir 1971); but the facts of this case do not warrant the application of that doctrine. Cf. id. We must be continually reminded that, while a limited intrusion into the home is constitutionally acceptable, under some circumstances, "physical entry of the home" is the principal concern of the fourth amendment. *United States* v. *United States District Court,* supra, 313. Under the limited circumstances of this case, we conclude that the trial court incorrectly found that exigent circumstances justified the warrantless entry of the police into the defendant's home.

## C

### FRUIT OF THE POISONOUS TREE

The state also argues, however, that even if the trial court incorrectly found that the entry of the defendant's home was justified under the emergency doctrine, such error was harmless because the evidence derived from the defendant was not obtained by the exploitation of an illegal seizure. The trial court concluded that even if the officer's entrance into the defendant's home was not justified by emergency circumstances, the blood alcohol test results and the statements subsequently made by the defendant while his arrest was being videotaped were nonetheless admissible because they were not the "fruit of an illegal arrest." We disagree.

Whether the evidence derived from an unlawful warrantless entry and arrest is attenuated from the initial unlawfulness must be answered on the facts of each case. *Brown* v. *Illinois,* 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). The determination of whether evidence has been obtained by exploitation of an illegal arrest generally includes, in addition to con-

sideration of whether *Miranda* warnings have been given, the consideration of "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the officer's misconduct." Id., 603–604. The burden of showing the admissibility rests upon the state. Id., 604. Applying these criteria to the present case, we find that the derivative evidence, namely, the defendant's statements, the intoximeter results, the videotape, and the photograph, must be suppressed.

We begin by noting that the state concedes in its brief that the time period between the arrest and the defendant's station house statements and consent to take the intoximeter test was minimal. The state argues, however, that certain intervening circumstances establish that the defendant voluntarily gave these statements, and his consent thus assured that they were not obtained by exploitation of the illegal arrest.

This particular issue is very similar to that addressed in *Brown* v. *Illinois,* supra, where the defendant, Brown, was the subject of an illegal arrest, brought into the police station, advised of his *Miranda* rights, and subsequently questioned about the homicide for which he had been arrested. Brown later gave a second incriminatory statement. The United States Supreme Court in *Brown* overturned the Illinois Supreme Court's admission of those statements into evidence and noted that "the State failed to sustain its burden of showing that the evidence in question was admissible under *Wong Sun.*[6] Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever." (Footnote added.) Id., 604. The court

---

[6] *Wong Sun* v. *United States,* 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

went on to hold the second statement inadmissible as well, reasoning that "[t]he fact that Brown had made one statement, believed to him to be admissible, and his cooperation with the arresting and interrogating officers in the search for [the suspect], with his anticipation of leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination. Cf. *Fahy* v. *Connecticut*, 375 U.S. 85 [84 S. Ct. 229, 11 L. Ed. 2d 171] (1963)." Id., 605 n.12.

In this case, the intervening circumstances upon which the state relies are that the officers read the defendant his *Miranda* warnings twice prior to his consenting to take the intoximeter test, his consent was obtained away from the arrest scene, the defendant was given an opportunity to contact an attorney prior to consenting, and the defendant consented after the police advised him of the implied consent statute, General Statutes § 14-227b.

Our analysis of these postarrest events leads us to conclude that there was a continuum of police contact with the defendant that was insufficient to eradicate the taint from the derivative evidence. Cf. id., 604–605. Thus, the *Miranda* warnings that the police gave the defendant subsequent to the illegal arrest had little effect in breaking the connection between the defendant's unlawful seizure and his statements and other derivative evidence. *Miranda* warnings are given to protect the defendant's fifth amendment rights, but do not fully protect the rights under the fourth amendment. Therefore, even if statements are found to be voluntary under the fifth amendment, the fourth amendment issue remains. In order to break the continuum between the illegal arrest and any subsequent statements obtained, the statements must be "sufficiently an act of free will to purge the primary taint."

*Wong Sun* v. *United States,* 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); see *Brown* v. *Illinois,* supra, 602–604; see also *Dunaway* v. *New York,* 442 U.S. 200, 216–18, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). "Arrests made without warrants or without probable cause . . . would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' See *Mapp* v. *Ohio,* 367 U.S. [643, 648, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)]." *Brown* v. *Illinois,* supra, 602–603.

Finally, the state would have us agree with the trial court's conclusion that, because of the "good faith"[7] intentions of the police in making the warrantless entry into the defendant's house, their actions were not tantamount to the "flagrant police misconduct" that is the subject of the *Brown* analysis. The state argues that we should, in effect, excuse that entry altogether and allow the derivative evidence here. This we cannot do. Having characterized the officers' conduct here as falling outside of the emergency doctrine, and having found, accordingly, that the entry violated the fourth amendment and that there existed a continuum of police action from that entry until the development of the derived evidence, we cannot now logically excuse that conduct under a "good faith" analysis. We conclude that the derivative evidence in this case was the

---

[7] We note that the state is not raising an argument that the actions of the police officers fall under the "good faith" exception to the warrant requirement enunciated in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), but rather, claims that the officers here "meant well."

tainted product of an illegal arrest. Accordingly, the trial court should have suppressed the challenged evidence.

## II

### INSUFFICIENCY OF THE EVIDENCE

Even if the evidence obtained as a result of the illegal arrest of the defendant were held to be admissible, the evidence of intoxication would still be insufficient to support a conviction under § 14-227a and § 53a-60d beyond a reasonable doubt. We will address each of these claims separately.

### A

#### OPERATING WHILE UNDER THE INFLUENCE OF LIQUOR

The state charged the defendant with violating § 14-227a (a) (2). The defendant claims that the state failed to meet its burden of proving that his blood alcohol content (BAC) was .10 or more at the time of his *operation* of a motor vehicle, as required by the statute. He claims that expert testimony was necessary to relate the results of the intoximeter (breathalyzer) tests back to the time of the offense in order to establish his guilt beyond a reasonable doubt. The defendant, while conceding that at the time the tests were administered his BAC exceeded .10, claims that the results of these tests were insufficient to prove that his BAC exceeded .10 *at the time of the offense.*

The accident occurred at 3 p.m.. The defendant admitted to drinking before the accident, but also testified that he had been drinking at home after the accident prior to his arrest. The defendant also consented to a breathalyzer test so that his present BAC could be gauged. The first test, administered at 4:08 p.m., over an hour after the accident, indicated that the

defendant had a BAC of .269, and the second test, administered at 4:41 p.m., indicated a slightly decreasing BAC based on a .265 reading.

Sanders F. Hawkins, the chief toxicologist of the department of health services, testified on behalf of the state. The state asked him certain questions to satisfy some of the foundational elements for the admissibility of chemical analysis under General Statutes § 14-227a (c), but it never asked him to extrapolate the defendant's blood alcohol content back to the time of the offense, that is, the time of the operation of the vehicle, based on the test results taken subsequent thereto.

The defendant claims that this evidence was insufficient to prove him guilty of operating while under the influence of liquor under our per se statute. On the basis of the legislative history of this statute, we agree.

In 1985, the Connecticut legislature amended General Statutes § 14-227a, the state's criminal provision for driving under the influence and driving while impaired, to provide for a per se offense. Per se drunk driving legislation provides that it is an offense (1) to drive a vehicle on a public highway (2) *while* one's BAC content is .1 percent or more. Whether the defendant suffered any impairment of his physical or mental faculties is not an element of the offense. Compare General Statutes § 14-227a (b).

There are two parts of the statutory scheme that appear to address this issue of whether expert extrapolation evidence is necessary. General Statutes § 14-227a (c) sets out six preconditions for admissibility of the chemical test. Subdivision (5) requires, with certain exceptions not relevant here, that "an additional chemical test of the same type [be] performed at least thirty minutes after the initial test was performed," and sudivision (6) provides that "evidence is presented which demon-

strates that the test results *and the analysis thereof* accurately reflect the blood alcohol content at the time of the alleged offense." (Emphasis added.)

The requirement for the second test, and the insertion into the sixth condition of admissibility of the phrase "and the analysis thereof" were the result of an amendment to the per se drunk driving bill on the floor of the House, prior to its ultimate passage, presented by Representative Richard Blumenthal. The legislative debate on the second test requirement[8]

---

[8] See, e.g., the following: "Essentially what we are doing if we pass this amendment is to establish . . . two methods of proof. One method of proof is the conventional or traditional method which relies on evidence of behavior. The person couldn't walk straight, couldn't talk correctly, all the observational kind of evidence that would ordinarily be admitted at a trial. The second method of proof that we would establish is what is commonly and what would be essentially called today the per se method which is essentially to rely on blood alcohol content. *What this amendment seeks to do is to make the measurement of blood alcohol content as reliable as possible by requiring two tests. The reason for the two tests is that in order to extrapolate back, in order to relate back to the time of the offense, that is the time the person was driving, it is necessary to establish a trend as to whether or not the blood alcohol content was going down or rising.* . . . The imposition, the use of two tests, assures that blood alcohol content will be established as reliably as possible at the time of the offense." (Emphasis added.) 28 H.R. Proc., Pt. 30, 1985 Sess., pp. 10853–54, remarks of Representative Richard Blumenthal. "[T]he reason for the second test is to assure the *analysis* show blood alcohol content at the time the person was driving. That earlier point in time . . . . So there are two objectives to this part of the amendment, not only to insure a second test for the sake of reliability as to the results of the first test, *but also to be able to establish as precisely as possible what the blood alcohol content was at the time the person was driving."* Id., pp. 10865–66, remarks of Representative Richard Blumenthal. "I am informed by the State's Chief Toxicologist, Dr. Stoleman, and by the Chief State's Attorneys Office both of whom by the way have been involved in the drafting of this amendment, that it is possible to relate back to extrapolate back in this way. *In fact, an expert testifying in court would very much prefer to have a second test because it would eliminate the need for other evidence by which he would testify as to what blood alcohol level was at an earlier point in time."* (Emphasis added.) Id., pp. 10871–72, remarks of Representative Richard Blumenthal.

and on the "analysis thereof" language[9] has convinced this court that the legislature, in enacting the per se legislation, contemplated that there would be expert testimony specifically relating the BAC at the time of the tests to the BAC at the time of operation of the motor vehicle.

As best we can ascertain, there is only one other state that requires expert extrapolation evidence[10]; see *State v. Dumont,* 146 Vt. 252, 499 A.2d 787 (1985). We are well aware that in reaching our conclusion that this evidence is required, we are adopting the minority position. The majority of jurisdictions that have addressed this issue have held that expert testimony is not necessary to relate the breathalyzer tests to the time of the driving and that states can utilize behavioral evidence, such as erratic driving, to corroborate the test results. It is significant to note, however, that many of these

[9] See, e.g., the following: "[I]f the blood alcohol content had dropped during the intervening time period, it would be possible to extrapolate back much as you would establish a graph curve and show that at the time the person was driving, the blood alcohol content was above .10." 28 H.R. Proc., Pt. 30, 1985 Sess., p. 10857, remarks of Representative Richard Blumenthal. "[B]ecause in most people, the blood alcohol content will be dropping following the time when the person is stopped, *the trend can be established through expert testimony very simply, that at the time the person was driving, that is in advance of the first test, it was even higher than at the time of the first test.*" Id., 10858–59, remarks of Representative Richard Blumenthal. "[A]s long as the *analysis* of both tests would establish blood alcohol content above .1 at the time the person was driving, the second method of proof can be used, that is the per se method." (Emphasis added.) Id., 10863, remarks of Representative Richard Blumenthal.

[10] In *Smith* v. *State,* 502 N.E.2d 122, 127 n.5 (Ind. Ct. App. 1986), the Indiana Court of Appeals agreed that, "[i]t would be necessary to show the blood alcohol content at the time of the offense by means of extrapolation or test results obtained at the time of the violation in order to support a conviction under [Indiana's per se drunk driving law]." The Indiana legislature, however, subsequently amended the statute to provide that if the test is conducted within a prescribed time period, the blood alcohol content at the time of the administration of the test was the offense. *Sullivan* v. *State,* 517 N.E.2d 1251 (Ind. Ct. App. 1988).

states have legislatively mooted the requirement of expert extrapolation evidence by providing in their per se drunk driving statutes that if the test is administered within a certain time after the offense, those results constitute the per se violation; see, e.g., *Erickson* v. *Municipality of Anchorage,* 662 P.2d 963, 964–65 (Alaska App. 1983) (presumption of violation if administered within four hours); *People* v. *Pritchard,* 162 Cal. App. 3d Supp. 13, 16, 209 Cal. Rptr. 314 (1984) (rebuttable presumption of illegal BAC if within three hours); *State* v. *Larson,* 429 N.W.2d 674, 675 (Minn. App. 1988) (within two hours); *People* v. *Mertz,* 68 N.Y.2d 136, 139, 497 N.E.2d 657, 506 N.Y.S.2d 290 (1986) (prima facie case established if administered within two hours); *State* v. *Ulrich,* 17 Ohio App. 3d 182, 190, 478 N.E.2d 812 (1984) (within two hours). Further, those statutes that have not provided that the tests be administered within a certain time period, do not contain language that can be compared to the phrase "and the analysis thereof" contained in our statute or to the legislative discussion behind the amendment. See, e.g., *Fuenning* v. *Superior Court in and for City of Maricopa,* 139 Ariz. 590, 680 P.2d 121 (1930); *State* v. *Miller,* 555 So.2d 391, 393 (Fla. App. 3 Dist. 1989); *State* v. *Knoll,* 110 Idaho 678, 681, 718 P.2d 589 (Ct. App.), cert. denied, 116 Idaho 466, 776 P.2d 828 (1986); *People* v. *Kozar,* 54 Mich. App. 503, 221 N.W.2d 170 (1974); *State* v. *Larson,* supra, 676–77; *Commonwealth* v. *Speights,* 353 Pa. Super. 258, 509 A.2d 1263 (1986).

Those states in which the statute does not address the issue of requiring expert extrapolation testimony recognize, however, that if the legislature expressed a clear intent that such evidence be required, a different result would be necessary. See, e.g., *State* v. *Ulrich,* supra, 191 (conclusion that expert testimony is not necessary because of absence of "clear statutory language requiring the need for expert testimony"); see

also *Fuenning* v. *Superior Court in and for City of Maricopa,* supra, 598–99; *State* v. *Knoll,* supra, 682; *People* v. *Kozar,* supra, 508–509; *Commonwealth* v. *Spreights,* supra, 265–66.

Our legislature, as discussed at length above, has clearly indicated its intent that extrapolation testimony be required to prove a violation of our per se drunk driving statute. Our conclusion on this issue forces us to reexamine this court's decision in *State* v. *Garrity,* 17 Conn. App. 376, 552 A.2d 452, cert. denied, 210 Conn. 813, 556 A.2d 1024 (1989).

In *State* v. *Garrity,* supra, this court was presented with the same claim with which we are presented in this case, namely, that there was insufficient evidence to sustain the per se conviction because there was no evidence relating the BAC at the time of the test to the level at the time of the offense. In *Garrity,* we rejected this claim and held that corroborative behavioral evidence was sufficient to show that the test results accurately reflected the defendant's BAC at the time of the offense. Id., 383–84. The corroborative evidence that this court held to be sufficient was the evidence of the defendant's drinking, his "shaky and unsteady" behavior, the one hour and forty minute time lapse before the test, and the fact that he neither drank nor smoked during that period between his arrest and the administration of the tests. Id., 384.

In reaching this result, *Garrity* specifically relied on *State* v. *Hancich,* 200 Conn. 615, 623–24, 513 A.2d 638 (1986). *Hancich* involved the admissibility of the breathalyzer test results under General Statutes § 14-227a (c) (6), the part of the admissibility provision that required "evidence . . . which demonstrates that the test results accurately reflect the blood alcohol content at the time of the alleged offense." The statute did not then have the "and the analysis thereof" lan-

guage in it. The *Hancich* court held sufficient to comply with subdivision (6), evidence that the test was administered forty-four minutes after the defendant's arrest, that he drank no alcohol in the interim, and that the testing equipment was accurate.

We must conclude that, in deciding *Garrity,* our reliance on *Hancich* was misplaced, and that the statute as amended in 1985 requires expert relation back testimony. First, when *Hancich* was decided, the test results raised only a rebuttable presumption of driving under the influence; they did not establish a per se offense. Second, the language "and the analysis thereof" and the requirement of a second test were not in the statute under consideration in *Hancich;* they were added when the 1985 General Assembly created the per se offense. Third, the legislative debate concerning the 1985 amendments indicates a legislative concern over the reliability of the test as indicating the blood alcohol level *at the time of the driving* and an understanding that this reliability would be corroborated with expert relation back testimony. Although the amendments adding the second test requirement and "the analysis thereof" language were to the admissibility section of the statute, the legislative debate seems to go well beyond admissibility into the area of sufficiency of evidence.

In light of the legislative history of the public act amending our operating under the influence statute and the legislative intent expressed during the debate on the act, we are convinced that our reliance on *Hancich* was misplaced and that our result in *Garrity* should have been different.

## B

### ASSAULT IN THE SECOND DEGREE WITH A MOTOR VEHICLE

The defendant was also convicted of violating General Statutes § 53a-60d, which provides that "[a] per-

son is guilty of assault in the second degree with a motor vehicle when, *while operating a motor vehicle under the influence of intoxicating liquor* . . . he causes serious physical injury to another person as a consequence of the effect of such liquor." (Emphasis added.) The defendant claims that the same argument made for § 14-227a (a) (2) applies equally to this section. We do not agree.

Our conclusion that extrapolation testimony is required in order to obtain a conviction under § 14a-227a (a) (2), in no way impacts on our determination of this issue. Section 53a-60d is not a per se violation, and that statute contains no language analogous to the language of § 14-227a (a) (2) that we interpreted as requiring extrapolation testimony. See *State* v. *LeRoy,* 16 Conn. App. 472, 477, 547 A.2d 940 (1988); *State* v. *Shaw,* 12 Conn. App. 294, 301, 530 A.2d 653 (1987). There is nothing in the language of § 53a-60d that precludes the state from introducing evidence of the defendant's behavior.

Because, however, we conclude that the trial court should not have admitted the evidence obtained as a result of the illegal arrest, we must set this conviction aside and remand this case for a new trial on this count only. *State* v. *Ostroski,* 186 Conn. 287, 294–95, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d (1982).

III

JURY INSTRUCTIONS

The defendant's final claim is that the trial court incorrectly instructed the jury on General Statutes §§ 14-227a (a) (2) and 53a-60d. Because we have concluded that the conviction of § 14-227a (a) (2) must be set aside, we need address this issue only as it relates to § 53a-60d because it is likely to recur at retrial. *State*

v. *Thurman,* 10 Conn. App. 302, 317, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 115 (1987).

The defendant claims that the trial court incorrectly instructed the jury on § 53a-60d during its instruction on the causation element and during its subsequent instruction on § 14a-227a (a) (2). Neither of these claims was preserved at trial. The defendant seeks review of both of these claims under the bypass doctrine of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). In order to determine whether these claims are reviewable under *Evans,* we must first determine whether they are of constitutional magnitude and whether they constitute violations of a fundamental right. *State* v. *Golding,* 213 Conn. 233, 240, 567 A.2d 823 (1989).

A

The defendant first challenges the trial court's instruction on causation. The state claimed that the cause of the accident was the defendant's failure to make a proper left turn, and the trial court included this allegation in its instruction. The defendant claims that the trial court should not have used General Statutes § 14-242, the statute providing for the civil violation of making an improper left turn, to explain to the jury what would constitute an improper left turn in the case before them.

Causation is an essential element of this offense of assault in the second degree with a motor vehicle. Because this claim implicates the defendant's right to be properly charged on all essential elements of the crime charged, we will review this claim under *Evans.* See *State* v. *Williams,* 202 Conn. 349, 363, 521 A.2d 150 (1987); *State* v. *Ostalaza,* 20 Conn. App. 40, 47, 564 A.2d 324 (1989).

The defendant claims that the trial court was incorrect when, after instructing on § 14-242 (e), it instructed

the jury as follows: "If you find that the vehicle of [the victim] was either in the intersection or so close thereto as to constitute an immediate hazard, then the statute is applicable, to give the right-of-way to the approaching car coming from the opposite direction, namely the one that [the victim] was driving."

The defendant claims first that the trial court should not have included any reference to § 14-242 in its charge because that statute was not involved in this case, and that its inclusion either lowered the state's burden of proof or confused the jury on the element of causation. A review of the charge as a whole reveals that this claim is without merit.

In reviewing a challenge to a jury instruction, we must look at the charge as a whole, without looking at any one portion in isolation. *State* v. *Quintana,* 209 Conn. 34, 51, 547 A.2d 534 (1988); *State* v. *Ostalaza,* supra, 48. Our review of the charge as a whole here reveals that, in its instruction on causation, the trial court instructed the jury that if it found that the defendant was the cause of the victim's injuries, it must find that his operation of the vehicle was the "predominant producing cause of the accident." The trial court then proceeded to instruct the jury that the state had to prove beyond a reasonable doubt that the defendant was driving while intoxicated and that the injury caused by the defendant was a consequence of that intoxication.

The defendant alternatively claims that if the trial court was correct in including reference to § 14-242 in its jury instructions, then it improperly failed to give a "complete" instruction as that approved in *Affinito* v. *Daniels,* 179 Conn. 388, 389, 426 A.2d 782 (1979). He claims that the trial court failed to provide adequate guidance to the jury on his theory of defense by failing to give the second half of the *Affinito* instruction,

that is, that if the jury found that the victim's car was not so close to the intersection when the defendant's car was about to turn left, a reasonably prudent person would believe that if the turn was made, no real immediate danger of collision existed, then the defendant had the right-of-way. See id.; *Randazzo* v. *Pitcher,* 17 Conn. App. 471, 474, 553 A.2d 1158 (1989). The second half of the *Affinito* charge was unnecessary here because the defendant at no time raised as a theory of defense that he had the right-of-way. Our review of the instructions as a whole reveals that the trial court adequately instructed the jury on the defendant's theory of defense, which was that the victim was travelling at an excessive rate of speed and that he was inattentive.

## B

The defendant next claims that the trial court should not have included in its subsequent instruction on § 14-227a (a) (2) that, where a person's BAC is .10 or more, under the influence is conclusively established. He argues that the jurors could have misapplied this "conclusive" standard to their determination of the "under the influence" element of § 53a-60d.

A review of the record in this case reveals that it does not support this claim. *State* v. *Golding,* supra. The trial court clearly instructed the jury on the elements of § 53a-60d separately from its instructions on the elements of § 14-227a (a) (2). It further instructed them on the distinct meaning of "under the influence" as used in each section. Because the instructions in this case are clear, it is presumed that the jury followed those instructions. *State* v. *Rodriguez,* 210 Conn. 315, 333, 554 A.2d 1080 (1989); *State* v. *Nelson,* 17 Conn. App. 556, 568, 555 A.2d 426 (1989). There is no merit to the instructional claims.

The judgment is reversed as to the conviction of operating while under the influence of liquor under General Statutes § 14-227a (a) (2) and of assault in the second degree with a motor vehicle under General Statutes § 53a-60d and the case is remanded with direction to render a judgment of acquittal of operating while under the influence of liquor and for a new trial on the charge of assault in the second degree with a motor vehicle under § 53a-60d.

In this opinion DUPONT, C. J., BORDEN, O'CONNELL and LAVERY, Js., concurred.

SPALLONE, J., with whom DALY and FOTI, Js., join, dissenting. The majority has concluded that the trial court could not have reasonably found that the warrantless entry into the defendant's home was justified under the emergency doctrine. Although this conclusion is phrased as a question of law, it is apparent to me that this court has impermissibly reevaluated the facts and reweighed the credibility of the police officers' testimony. However zealously we would champion a citizen's right to be secure in his home, our power to upset the trial court's findings on appeal is limited. *State* v. *Zindros,* 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984).

The well settled standard of review of fourth amendment issues on appeal is whether the trial court's decision is clearly erroneous. Id.; *State* v. *Hamilton,* 17 Conn. App. 385, 388–89, 552 A.2d 834 (1989), aff'd, 214 Conn. 692, 573 A.2d 1197 (1990); *State* v. *Enright,* 17 Conn. App. 142, 146, 550 A.2d 1095 (1988). It is not our function to find facts or to draw conclusions from primary facts found, and it is error for us to do so. See *State* v. *Reagan,* 209 Conn. 1, 8, 546 A.2d 839 (1988). Our function is to determine, in light of the whole record, whether the trial court could reasonably have concluded as it did. *State* v. *Hamilton,* supra, 389.

The record here indicates that the trial court properly held the police officers to the stringent objective test we approved in *State* v. *Klauss,* 19 Conn. App. 296, 302, 562 A.2d 558 (1989). In denying the defendant's motion to suppress, the trial court specifically found that, under all the circumstances, the police officers had an objectively reasonable belief that the defendant needed immediate aid justifying an emergency entry into the house. The facts as accepted by the trial court are concededly inconclusive as to whether the defendant needed immediate assistance. These facts are, however, no less a reasonable basis for action than those in *State* v. *Klauss,* supra. In *Klauss,* for example, we approved the warrantless police entry as an emergency although the police had no first hand knowledge of the emergency circumstances, had delayed before effecting entry, and had little expectation that the defendant was even on the premises. Id., 299.

Absent a trail of blood or cries for help, we must inevitably rely on trained officers to take prompt action to protect lives despite inconclusive evidence of necessity. We must, therefore, rely on the trial court's decision as to the weight of the evidence and the credibility of the police testimony. See *State* v. *Zindros,* supra, 240. Whether this court believes the testimony of these officers is irrelevant. Our skepticism cannot justify an invasion of the trier's province. See id., 254.

The trial court here reached a reasonable conclusion based on the record and I cannot agree with the majority that this decision was clearly erroneous. Because I cannot join in substituting our judgment for that of the trial court, I must respectfully dissent on this issue. I join the majority in the legal conclusions reached on issues II A and III. I cannot, however, join in the remand because my disagreement on the first issue would render a different result.