STATE OF CONNECTICUT *v.* PETER LUURTSEMA
(SC 16745)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

---

Argued September 24—officially released December 24, 2002

Glenn W. Falk, special public defender, for the appellant (defendant).

Timothy J. Sugrue, senior assistant state's attorney, with whom, on the brief, were James E. Thomas, state's attorney, and Dennis J. O'Connor, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Peter Luurtsema, was convicted, after a jury trial, of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[1] and 53a-70 (a) (1),[2] kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[3] assault in the second degree in violation of

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

General Statutes § 53a-60 (a) (1),[4] and, following a plea of nolo contendere, of being a persistent dangerous felony offender under General Statutes (Rev. to 1997) § 53a-40 (a).[5] On appeal[6] from the judgment of the trial court sentencing him to a total effective sentence of forty-five years imprisonment,[7] the defendant claims that: (1) the trial court improperly denied his motion to suppress the statement he gave to the police following his warrantless home arrest; and (2) the evidence was insufficient to convict him of kidnapping. We affirm the judgment of the trial court.

---

[4] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

[5] General Statutes (Rev. to 1997) § 53a-40 (a) provides in relevant part: "A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or third degree, aggravated sexual assault in the first degree, sexual assault in the third degree with a firearm, robbery in the first or second degree, or assault in the first degree, and (2) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution, for any of the following crimes: (A) The crimes enumerated in subdivision (1) of this subsection, murder, or an attempt to commit any of said crimes . . . ."

[6] The Appellate Court transferred this case to this court pursuant to Practice Book § 65-2, which provides in relevant part: "If, at any time before the final determination of an appeal, the appellate court is of the opinion that the appeal is appropriate for supreme court review, the appellate court may file a brief statement of the reasons why transfer is appropriate. The supreme court shall treat the statement as a motion to transfer and shall promptly decide whether to transfer the case to itself." In this instance, the Appellate Court recognized that the outcome of this appeal depended on the proper interpretation of our decision in State v. Geisler, 222 Conn. 672, 610 A.2d 1225 (1992), which had been the subject of some confusion. Therefore, rather than render a decision potentially in conflict with other Appellate Court decisions, it recommended transfer to this court for a final determination as to the proper interpretation of that case.

[7] The defendant was sentenced to concurrent prison terms of twenty years for attempted sexual assault in the first degree and forty years for kidnapping in the first degree as a persistent dangerous felony offender, with a consecutive prison term of five years for assault in the second degree.

The trial court, *Mulcahy, J.*, denied the defendant's motion to suppress his statement. Thereafter, the case was tried to a jury on part A of the information, and the defendant was convicted of attempted sexual assault in the first degree, kidnapping in the first degree and assault in the second degree. The defendant then entered a plea of nolo contendere to part B of the information charging him with being a persistent dangerous felony offender, and the trial court, *Clifford, J.*, accepted the plea. Thereafter, the trial court, *Mulcahy, J.*, rendered judgment on the verdict and the plea. This appeal followed.

The jury reasonably could have found the following facts. On the evening of April 21, 1998, the defendant visited the victim at her apartment in Manchester. During the course of the night, the defendant and the victim consumed several beers and smoked crack cocaine. At some point prior to midnight, the victim consented to oral sex from the defendant. At approximately 1 a.m., Larry Brown, a neighbor, visited the victim in her apartment while the defendant was still there. Outside the presence of the victim, the defendant asked Brown to leave because he wanted to be alone with the victim. Brown complied with the defendant's request. At the time Brown left, he did not observe any marks on the victim's face.

Shortly after Brown's departure, the defendant and the victim were seated next to each other on the couch. The defendant proceeded to pull the victim to the floor and remove her pants and underpants. While they were on the floor, the defendant forced the victim's legs apart in an extremely harsh manner and began manually choking her to the point where she could no longer breathe. The defendant then got up and moved toward the bathroom, at which time the victim ran screaming from her apartment, naked from the waist down, to a

convenience store across the street where the police were summoned.

Officer Edward Ciolkosz, of the Manchester police department, arrived at the convenience store at approximately 2:30 a.m. The victim was quite distraught at this time and displayed visible facial and neck injuries. The victim could not confirm that the defendant actually struck her in the facial area. The testimony presented at trial, however, revealed that the defendant was the only person in the victim's company between 1 a.m., when, according to Brown's testimony, he did not recall seeing any physical injuries, and 2:30 a.m., when the police and other witnesses observed the victim's condition. Further, the testimony of Arkady Katsnelson, an associate state medical examiner, revealed that the victim's injuries were consistent with manual strangulation. Ciolkosz subsequently escorted the victim back to her apartment, which was found to be unoccupied.

I

The defendant first claims that the trial court improperly denied his motion to suppress the statement he gave to the police following his warrantless home arrest. We disagree.

At the outset, we set forth the standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998). The issue presently before us is whether the trial court properly concluded that the

defendant's statement was sufficiently attenuated from the taint of the unlawful arrest. None of the trial court's factual findings underlying its decision are in dispute. Thus, this issue raises purely a question of law, and our review is plenary. See *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001); *State* v. *Blackman*, supra, 553.

The evidence on the motion to suppress was as follows. On April 22, 1998, Michael Morrissey, a detective for the Manchester police department, was assigned to investigate the case. Morrissey was informed that, in addition to being the subject of the complaint of the victim in this case, the defendant was the subject of an ongoing sexual assault investigation in connection with a prior incident. Morrissey determined that the present case involved more violence than the prior incident involved. In light of the information obtained during the investigation of the present case as well as the defendant's criminal history, Morrissey concluded that the defendant posed a threat to the community. On this basis, Morrissey went to the defendant's residence, without a warrant, for the purpose of arresting him. After knocking on the defendant's door without receiving an answer, Morrissey explained the circumstances to the superintendent of the building, who then granted him access to the defendant's residence. Once inside, Morrissey arrested the defendant.

Morrissey booked the defendant after transporting him to the Manchester police department at approximately 12:45 p.m. At 1 p.m. on the same afternoon, another member of the Manchester police department gave the defendant a standard notice of rights form as part of the standard booking procedure. Morrissey testified that the standard notice of rights sets forth a defendant's *Miranda*[8] rights. At 10 p.m., after the defendant was again informed of his *Miranda* rights,

---

[8] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Morrissey approached the defendant seeking to interview him. The defendant stated that he understood his rights and that he was willing to talk. Approximately one hour later, nearly eleven hours after the initial arrest, the defendant provided Morrissey with a written statement. In his statement, the defendant denied ever having oral sex or intercourse with the victim, but stated that at different times on the day in question, they had been "fooling around." The defendant further denied ever hitting or choking the victim and stated that he left her apartment at approximately 12:30 a.m. on April 22.

The trial court denied the defendant's motion to suppress and issued an oral decision for the record containing a complete statement of the factual and legal justifications underlying its denial of the defendant's motion. The trial court found that Morrissey's arrest of the defendant was supported by probable cause, but that the arrest, which took place inside the defendant's home, was unsupported by the requisite warrant. The court concluded, however, that there was nothing in the facts to indicate that Morrissey had gone to the defendant's home seeking evidence. The court found that Morrissey did not conduct a search once inside the defendant's home, and that no evidence was obtained from inside the home. The court also found that ten or eleven hours had elapsed between the time of the unlawful arrest and the defendant's statement. The trial court also examined the reasons proffered by Morrissey as to why the circumstances necessitated the immediate arrest of the defendant rather than the procurement of an arrest warrant. After reviewing Morrissey's testimony, the court held that, although the present facts did not satisfy either the emergency or exigency exception to the warrant requirement, "the issue [was] indeed a close one." It also found that the defendant had received *Miranda* warnings twice before giving the statement.

On the basis of these findings, the trial court, after concluding that the emergency and exigency exceptions to the arrest warrant requirement were not satisfied in this case, determined, nevertheless, that the defendant's statement was sufficiently attenuated from the taint of the unlawful arrest. The court stated that the "[r]elevant factors to be considered in conducting an attenuation analysis are whether the defendant was given *Miranda* rights, the temporal proximity between the arrest and the statements sought to be suppressed, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct." The trial court initially found a lack of temporal proximity, because ten or eleven hours had elapsed between the unlawful arrest and the defendant's statement. The court also determined that, under its interpretation of the controlling precedent; *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992); either the passage of time *or* intervening circumstances could attenuate the taint of an unlawful arrest under the totality of the circumstances. Therefore, finding that the lack of temporal proximity between the defendant's statement and the unlawful arrest was "sufficient attenuation to purge any possible taint," and that the unlawful arrest was causally unconnected to the defendant's voluntary statement, the trial court denied the defendant's motion to suppress.

The defendant contends that the statement he gave Morrissey while in custody at the Manchester police department should have been suppressed by the trial court because it was obtained pursuant to an arrest in the home, in violation of article first, § 7,[9] of the constitution of Connecticut. According to the defen-

[9] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

dant, the issuance of *Miranda* warnings did not break the chain of events that began with his unlawful arrest and culminated in his statement. In support of this position, the defendant points to the fact that he remained alone in custody at the Manchester police department and was eventually confronted by, and gave the statement to, the same officer who had performed the unlawful arrest. The defendant contends that, as a result of this unbroken continuum of circumstances, the statement he gave to Morrissey was tainted by the unlawful arrest. The state contends, to the contrary, that, in light of the totality of the circumstances, including the passage of approximately eleven hours between the arrest and the statement, the defendant's having twice received *Miranda* warnings, and the fact that the police misconduct was neither purposeful nor flagrant, the defendant's statement was sufficiently attenuated from the taint of the unlawful arrest and thus properly admitted by the trial court. We agree with the state.

The defendant questions the propriety of the trial court's attenuation analysis as a matter of law. The defendant claims that the trial court attached undue significance to the time interval between the unlawful arrest and the defendant's statement, without recognizing the importance of the defendant's essentially unchanged circumstances during this time period. The defendant contends that the lack of intervening circumstances, as evidenced by his unchanged circumstances, is dispositive of the attenuation issue. Thus, the defendant claims, the trial court should have found that the taint of the unlawful arrest was not sufficiently attenuated at the time the defendant gave his statement.

Before we address the merits of the defendant's claim, we must clarify the proper analysis under article first, § 7, for determining whether a statement obtained following an unlawful warrantless home arrest, supported by probable cause, is sufficiently attenuated

from the taint of the unlawful arrest so as to render it admissible. This requires us briefly to trace the history of the attenuation doctrine.

As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "[T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States* v. *Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). To carry out this purpose adequately, the rule does not distinguish between physical and verbal evidence; see *Wong Sun* v. *United States*, supra, 485–86; nor does it apply only to evidence obtained as a direct result of the unlawful activity. See *Nardone* v. *United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). Rather, the rule extends to evidence that is merely derivative of the unlawful conduct, or what is known as the "fruit of the poisonous tree." See id. The application of the rule, however, is restricted to those situations where its objectives are "most efficaciously served." *United States* v. *Calandra*, supra, 348. Limiting the rule's application recognizes "that in some circumstances strict adherence to the . . . rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes." *Brown* v. *Illinois*, 422 U.S. 590, 608–609, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring). Thus, "evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint' . . . ." *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

The United States Supreme Court in *Wong Sun* v. *United States,* supra, 371 U.S. 487–88, provided an explanation of what is meant by the phrase "attenuating the taint" of an unlawful arrest. In *Wong Sun,* the court ruled on the admissibility of statements made by two of the petitioners, James Wah Toy and Wong Sun, following their warrantless home arrests. Id., 474, 475. In that case, neither arrest was supported by probable cause. Id., 479, 491. The court stated that, in the context of the fourth amendment, not all evidence "is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Internal quotation marks omitted.) Id., 488.

The statements made in *Wong Sun* were on either end of the temporal spectrum in relation to the unlawful arrest. Toy gave his statement shortly after several police officers chased him into his home, placed him in handcuffs and immediately under arrest. Id., 486. In ruling that his statement was inadmissible, the court held that, under those circumstances, "it [was] unreasonable to infer that Toy's [statement] was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. Wong Sun, on the other hand, made his statement upon his voluntary return to the police station several days after being released on his own recognizance. Id., 491. The court concluded that Wong Sun's statement was admissible because "the connection between the arrest and the statement had become so attenuated as to dissipate the taint." (Internal quotation marks omitted.) Id. Therefore, in accordance with *Wong Sun,* the exclusionary rule need only bar that evidence deemed insufficiently attenuated from

the taint of the underlying official misconduct in order to protect adequately the rights afforded citizens under the fourth amendment.

The attenuation doctrine continued to evolve in subsequent cases. In *Brown* v. *Illinois*, supra, 422 U.S. 591, the United States Supreme Court was once again confronted with a situation where the petitioner, Brown, had made inculpatory statements after he was arrested inside his home without a warrant and without probable cause. Of particular importance to that case, was the fact that before Brown made those statements, the police advised him of his *Miranda* rights. Id. The Illinois courts had determined that the issuance of *Miranda* warnings, per se, attenuated the taint of the underlying misconduct, and the courts therefore ruled that Brown's statements were admissible. Id., 597. The United States Supreme Court disagreed and specifically held that when police obtain statements from an individual following a warrantless home arrest that is not supported by probable cause, the issuance of *Miranda* warnings does not automatically attenuate the taint of the unlawful arrest so as to render the statements admissible. Id., 605. The court's rationale was that if such a per se rule existed, "[a]rrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." Id., 602. The court further declined to adopt *any* per se rule as controlling the attenuation issue, but, rather, pronounced a facts and circumstances test to be applied to the facts of each case, with no single fact being dispositive of the outcome. Id., 603. The relevant factors under the United States Supreme Court's test included whether *Miranda* warnings had been issued, the temporal proximity of the arrest and the statement, "the presence of intervening

circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct . . . ." (Citation omitted.) Id., 603–604. The court concluded that, "in light of the distinct policies and interests of the Fourth Amendment"; id., 602; such a test was required. Id., 603–604.

In *New York* v. *Harris*, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990), the United States Supreme Court subsequently limited the applicability of the attenuation doctrine in circumstances in which the police have probable cause to make the arrest. The court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after [a warrantless] arrest made in the home . . . ." Id., 21. The court reasoned "that attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity." (Internal quotation marks omitted.) Id., 19. When police have probable cause to arrest a suspect, any custody and questioning of the suspect once the suspect is outside of his home is lawful. Therefore, any statements thereby obtained are not the product of unlawful activity, and there is no need to apply an attenuation analysis. Id.

Subsequent to the United States Supreme Court's decision in *Harris*, we decided *State* v. *Geisler*, supra, 222 Conn. 672, wherein we held that the exclusionary rule bars evidence obtained in violation of article first, § 7, of the constitution of Connecticut that otherwise would be admissible under the federal constitution according to the holding in *Harris*. Id., 690. We note that our decision in *Geisler*, was preceded by two Appellate Court decisions, *State* v. *Geisler*, 22 Conn. App. 142, 576 A.2d 1283 (*Geisler I*), cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated, 498 U.S. 1019, 111 S. Ct.

663, 112 L. Ed. 2d 657 (1991), and, on remand, *State* v. *Geisler*, 25 Conn. App. 282, 594 A.2d 985 (1991) (*Geisler II*), which was affirmed by this court in *State* v. *Geisler*, supra, 222 Conn. 672 (*Geisler III*). The decision in *Geisler I*, which was released less than one month after *Harris* was decided, was grounded on federal principles of attenuation law as articulated in *Brown*, and thus the United States Supreme Court's decision in *Harris* necessitated that *Geisler I* be vacated and remanded.[10] See *Geisler II*, supra, 25 Conn. App. 283–84. On remand, the Appellate Court in *Geisler II* held that, despite the narrower application of attenuation analysis under the federal constitution in *Harris*, the constitution of Connecticut mandated application of the broader rule as articulated in *Brown*. Id., 292. We affirmed the Appellate Court's decision in *Geisler III*, supra, 222 Conn. 690.

In the incident from which the *Geisler* opinions arose, police had entered the defendant's home without a warrant, but with probable cause to arrest him. *Geisler I*, supra, 22 Conn. App. 148. The police questioned the defendant both inside and outside of the home and ultimately placed him under arrest. Id., 147. The police gave the defendant *Miranda* warnings following the arrest and transported the defendant to the station house. Id. While at the station house, the defendant answered continued questioning and, additionally, underwent various sobriety tests. *Geisler III*, supra, 222 Conn. 679.

In *Geisler I*, the Appellate Court, relying on *Brown* v. *Illinois*, supra, 422 U.S. 590, for its attenuation analysis, concluded that the trial court improperly admitted the evidence obtained by the police subsequent to the unlawful arrest. *Geisler I*, supra, 22 Conn. App. 155.

---

[10] Although the defendant challenged the constitutionality of the police action in *Geisler I* under our state constitution, the Appellate Court decided *Geisler I* solely on the basis of the constitution of the United States and then existing case law.

Applying the *Brown* facts and circumstances test, the court held that "there was a continuum of police contact with the defendant that was insufficient to eradicate the taint from the derivative evidence." Id., 157. The court noted that Geisler's statements were separated from the unlawful arrest by a minimal period of time. Id., 156. Additionally, the Appellate Court rejected the trial court's conclusion that the police officer's actions were predicated on " 'good faith' " intentions and thus did not constitute the " 'flagrant police misconduct' that is the subject of the *Brown* analysis." Id., 158. Rather, the court found that a good faith determination was unsupported by the facts, as "there existed a continuum of police action from [the unlawful entry] until the development of the derived evidence . . . ." Id. Therefore, the evidence "was the tainted product of an illegal arrest." Id., 158–59.

In *Geisler II*, supra, 25 Conn. App. 282, the Appellate Court reconsidered its holding in light of the *Harris* decision. The court concluded that article first, § 7, of the constitution of Connecticut provided greater protections than the fourth amendment to the United States constitution and, accordingly, rejected the *Harris* analysis for determining the admissibility of evidence obtained pursuant to a warrantless home arrest that is supported by probable cause. Id., 292. The court viewed the admissibility of such statements under *Harris* as depending on " 'whether the illegality itself was continuing at the time the evidence was secured.' " Id., 291. The Appellate Court viewed this line of reasoning as flawed in that "the first two factors of the *Brown* attenuation analysis, namely temporality and intervening circumstances, would be irrelevant because time would never pass and circumstances would never intervene between the time the unlawfulness occurred and the time the evidence was acquired." Id. The court determined, therefore, that the appropriate inquiry under the

constitution of Connecticut is " '[w]hether the evidence derived from an unlawful warrantless entry and arrest is attenuated from the initial unlawfulness' based on the facts of each case." Id., 292. Accordingly, the court affirmed the decision in *Geisler I*. Id., 293.

In our decision in *Geisler III*, supra, 222 Conn. 690, we affirmed the Appellate Court's rejection of *Harris* under our state constitution. In doing so, we recognized that "[t]he sanctity of the home has a well established place in our jurisprudence." Id., 687. Further, we agreed with the concerns expressed in the dissent to *Harris*, that the majority opinion's holding "create[d] powerful incentives for police officers to violate the Fourth Amendment." (Internal quotation marks omitted.) Id. We concluded that "the *Harris* rationale [fell] short of the protection required under our state constitution," and "that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances." Id., 690.

Although *Geisler III* referred to only two of the *Brown* factors, and made no mention of the *Brown* decision itself, *Geisler III* should not be intrepeted as requiring merely the passage of time or intervening circumstances as a basis for finding attenuation. Under such an interpretation, the simple expedient of placing the defendant in a holding cell for the requisite time period following a warrantless home arrest would automatically attenuate the taint of the arrest. Such a per se rule would substantially dilute the effects of the exclusionary rule and was flatly rejected by the United States Supreme Court in *Brown*. *Brown* v. *Illinois*, supra, 422 U.S. 602. Additionally, a literal reading of *Geisler III* as limiting the attenuation analysis to consideration of temporal proximity or the presence of intervening circumstances neglects consideration of the purpose and flagrancy of the police misconduct. In the

past, we have stressed the importance of this factor as it "effectuates the deterrence policy of the exclusionary rule by providing an incentive for police to engage in lawful conduct." *State* v. *Ostroski*, 201 Conn. 534, 549, 518 A.2d 915 (1986). Allowing the taint of an unlawful arrest to be attenuated by the mere passage of time, without consideration of the purpose and flagrancy of the police misconduct, provides no more protection, in reality, than does the rule in *Harris*. In light of the emphasis placed by *Geisler III* on the sanctity of the home as well as the dangers of unfettered police misconduct, any interpretation of *Geisler III* that does not provide greater protection to the citizens of this state than would have been provided under *Harris* must be rejected under our state constitution.

Therefore, we interpret *Geisler III* as properly rejecting the per se rule announced in *Harris* and, instead, requiring an attenuation analysis, based on all of the facts and circumstances, pursuant to our state constitution when the state seeks to introduce evidence that was obtained as a result of a warrantless home arrest that is supported by probable cause. Further, by referring to only two of the *Brown* factors in *Geisler III*, this court was neither limiting what is to be considered under the facts and circumstances test, nor emphasizing the importance of any one factor. Rather, in highlighting these two factors, we recognized their continued relevance based on our rejection of *Harris*.[11] We conclude, therefore, that, in light of the principles announced in *Geisler III*, as well as the history of case law underscoring the purpose of the attenuation doctrine, the *Brown* facts and circumstances test provides the proper analytical framework for determining whether the taint of a warrantless home arrest that is supported by probable

---

[11] As previously discussed, under *Harris*, both temporal proximity and intervening circumstances are irrelevant in analyzing the admissibility of unlawfully obtained evidence. See *Geisler II*, supra, 25 Conn. App. 291.

cause is sufficiently attenuated. Although we acknowl-
edge that *Brown* is factually distinguishable from the
incident underlying the *Geisler* decisions inasmuch as
the warrantless home arrest at issue in *Brown* was
unsupported by probable cause, the rejection in *Geisler
II* and *Geisler III* of the *Harris* rule makes this factual
distinction less significant. Accordingly, we apply the
*Brown* facts and circumstances test to resolve the issue
in the present case.

In the present case, approximately eleven hours
elapsed between the time of the unlawful arrest and the
defendant's statement. Thus, the defendant's statement
lacked temporal proximity to the unlawful arrest.
Although there is no bright-line test for determining
whether a statement lacks temporal proximity to an
unlawful arrest, our conclusion is consistent with our
prior case law. See *State* v. *Blackman*, supra, 246 Conn.
557 (statements made fourteen hours after illegal police
stop lacked temporal proximity); *State* v. *Daugaard*, 32
Conn. App. 483, 501, 630 A.2d 96 (1993)(statement made
eight or nine hours after unlawful arrest lacked tempo-
ral proximity), aff'd, 231 Conn. 195, 647 A.2d 342 (1994).
Moreover, any argument that the trial court attached
undue significance to the lack of temporal proximity
between the arrest and the statement is unsupported
by the record. The trial court considered all of the
factors under the *Brown* test and explicitly referenced
each factor in its decision. Although the trial court's
concluding statement in denying the motion to suppress
was that, "there was indeed sufficient attenuation to
purge any possible taint, that is sufficient time," this
isolated statement, when viewed in context of the
entirety of the court's decision, does not indicate that
the trial court failed to consider the totality of the cir-
cumstances.

The lack of temporal proximity in this case is signifi-
cant because there is no evidence that the defendant,

from the time he was arrested up until the time he gave the statement, did anything other than sit in jail. See *State* v. *Daugaard*, supra, 32 Conn. App. 501. From case to case, the temporal proximity factor takes on less significance where the police continually harass the defendant once he is taken into custody. See *Taylor* v. *Alabama*, 457 U.S. 687, 691, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982). When, however, the police make no attempt to solicit information from a defendant once he is in custody, as in the present case, the temporal proximity factor must favor a finding of attenuation. Otherwise, it becomes nugatory under any attenuation analysis.

In addition to lacking temporal proximity to his arrest, the defendant's statement was voluntary. The defendant received *Miranda* warnings twice prior to making his statement, and, given his criminal history, we can presume he was fully aware of what these rights entailed. See *State* v. *Schroff*, 206 Conn. 182, 201–202, 536 A.2d 952 (1988) (taking defendant's prior contact with law into consideration when determining voluntariness of statement). Although *Miranda* warnings alone are not sufficient to attenuate the taint of an unlawful arrest, they are an important factor in the analysis. See *Brown* v. *Illinois*, supra, 422 U.S. 603.

Finally, the unlawfulness of the arrest was neither flagrant nor purposeful. The facts indicate that the defendant was arrested solely because of his violent disposition and not as a means of enabling law enforcement personnel to uncover evidence that otherwise would have been unattainable. Compare *Brown* v. *Illinois*, supra, 422 U.S. 605 (admitted purpose of police misconduct was for investigation and questioning). The trial court found that the arresting officer never conducted a search of the defendant's home, and that no evidence was seized from the home. Accordingly, the trial court's conclusion that the unlawfulness of the

arrest lacked an investigatory purpose or flagrancy is fully supported by the record. Consideration of the purpose and flagrancy of the official misconduct "effectuates the deterrence policy of the exclusionary rule . . . ." *State* v. *Ostroski*, supra, 201 Conn. 549. Considering the lack of either improper purpose or flagrant misconduct in this case, we conclude that the deterrent effect of suppressing the statement would be minimal.

The defendant claims, nonetheless, that the lack of temporal proximity and the advisement of *Miranda* rights in this case were not enough to attenuate the taint of the unlawful arrest. Specifically, the defendant claims that, because he "remained in custody alone, only to be confronted again by the same officer who invaded his home without a warrant," the taint of the unlawful arrest remained at the time he gave his statement. Relying on this argument, the defendant essentially urges us to hold that the lack of intervening circumstances in this case necessitates the conclusion that the taint of the unlawful arrest was not sufficiently attenuated. We recognize that, in the past, the presence of intervening circumstances has been held to be an important factor in assessing whether, under the totality of the circumstances, an unlawful arrest is sufficiently attenuated. See *State* v. *Blackman*, supra, 246 Conn. 558; *State* v. *Daugaard*, supra, 32 Conn. App. 499. We have never held, however, that the *absence* of intervening circumstances is conclusive of a lack of attenuation. To hold so would essentially make the presence of intervening circumstances a threshold requirement to a finding of attenuation and thus be in direct contravention to the guiding principles announced in *Brown*. See *Brown* v. *Illinois*, supra, 422 U.S. 603.

Accordingly, after weighing the above factors, we conclude that the defendant's statement was sufficiently purged from the taint of the unlawful arrest. We

therefore reject the defendant's challenge to the trial court's denial of his motion to suppress.[12]

## II

We next address the defendant's claim that the evidence presented at trial was insufficient to support the jury's verdict of guilty of kidnapping under General Statutes § 53a-92 (a) (2) (A). The defendant contends that the movement of the victim from the couch to the floor, the removal of the victim's clothes, the forcing of the victim's legs apart and the manual choking of the victim did not constitute kidnapping. Specifically, the defendant claims that the movement of the victim in this case falls short of what is required for "abduction" under the kidnapping statute. Further, the defendant characterizes the movement of the victim as merely "incidental" to the sexual assault. Therefore, the defendant contends that the evidence can support the verdict only on the charges of attempted sexual assault in the first degree and assault in the second degree. We are not persuaded by the defendant's arguments.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quota-

---

[12] In light of our decision that the trial court properly admitted the defendant's statement, we need not address the state's claim that admission of the statement was harmless error. We do note, however, that the defendant's statement contained a complete denial of culpability.

tion marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517, 782 A.2d 658 (2001).

"A person is guilty of kidnapping in the first degree, pursuant to General Statutes § 53a-92 (a) (2) (A), if he abducts another person and . . . restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually . . . . General Statutes § 53a-91 (2) defines abduct as restrain[ing] a person with intent to prevent his liberation by . . . (B) using or threatening to use physical force or intimidation. The term restrain is also defined in § 53a-91 (1) as restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 464–65, 441 A.2d 758 (2000).

We recognize that common notions regarding the crime of kidnapping envisage the carrying away of a person under coercion and restraint. Although this type of movement undoubtedly can serve as the basis for kidnapping, our kidnapping statute does not require such movement. Rather, all that is required under the statute is that the defendant have abducted the victim and restrained her with the requisite intent. See *State* v. *Niemeyer*, supra, 258 Conn. 520. Under the aforementioned definitions, the abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant, acting with the intent to inflict physical injury upon her or sexually abuse her, moves her from one place to another *or* restricts her movement by confining her in the place where the restriction commenced. Nowhere in this language is there a

requirement of movement on the part of the victim. Rather, we read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. Therefore, the relevant inquiry under our kidnapping statute is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation.

In light of our conclusion that the kidnapping statute does not require movement of the victim, the defendant's arguments are without merit. In rejecting the defendant's arguments, we emphasize that our "legislature [has] not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping." (Internal quotation marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 465; see also *State* v. *Gomez*, 225 Conn. 347, 350–51, 622 A.2d 1014 (1993); *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977). Thus, any argument imputing a temporal requirement to the restraint element or a distance requirement for abduction under the kidnapping statute must fail. Furthermore, any argument that attempts to reject the propriety of a kidnapping charge on the basis of the fact that the underlying conduct was "integral or incidental" to the crime of sexual assault also must fail. *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983). The defendant's interpretation of the kidnapping statute is simply not the law in this state. Id. "It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." (Internal quotation marks omitted.) *State* v. *Hanson*, 210 Conn. 519, 529, 556 A.2d 1007 (1989).

Accordingly, "[t]he proper inquiry is not whether the kidnapping was incidental to [other offenses], but whether the restraint was accomplished with the requisite intent to constitute kidnapping, as well as the state

of mind required for [the other offenses]. Whether the essential elements of kidnapping are proved beyond a reasonable doubt is a question for the jury. . . . The analysis, therefore, is not simply transactional. A defendant may be convicted of two crimes that derive from the same conduct as long as the state [is] able to prove, beyond a reasonable doubt, all of the essential elements of each crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilcox,* supra, 254 Conn. 466; see also *State* v. *Vass,* supra, 191 Conn. 614–15 ("[t]his court has repeatedly held that if the state proves all of the elements of kidnapping, including the specific intent to restrain, beyond a reasonable doubt, the defendant may be convicted of kidnapping in addition to another felony, even though the two offenses arose out of the same conduct").

In the present case, the evidence revealed that the defendant pulled the victim from the couch to the floor and removed her pants and underpants. The evidence further revealed that, once the victim was on the floor, the defendant forced her legs apart and choked her to the point where she could not breathe. On the basis of these facts, we conclude that the jury reasonably found that the defendant, through his violent actions, restrained the victim with the intent to prevent her liberation.

Finally, we note that, in the past, this court has considered whether our kidnapping statute is unconstitutionally vague as applied to the facts of any particular case. See *State* v. *Troupe,* 237 Conn. 284, 313, 677 A.2d 917 (1996); *State* v. *Tweedy,* 219 Conn. 489, 502, 594 A.2d 906 (1991); *State* v. *Jones,* 215 Conn. 173, 178, 575 A.2d 216 (1990). Without ever holding the statute unconstitutional, this court has recognized that "there are conceivable factual situations in which charging a defendant with kidnapping based upon the most minuscule [duration of confinement] would result in an

absurd and unconscionable result . . . ." (Internal quotation marks omitted.) *State* v. *Troupe,* supra, 315. In the present case, however, the defendant has not challenged the statutory provisions as being unconstitutionally vague as applied to him. Thus, we can neither acknowledge nor reject the merits of such a constitutional claim. The defendant has attacked only the sufficiency of the evidence supporting his kidnapping conviction, without reference whatsoever to the constitutionality of the kidnapping statute.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and BORDEN and VERTEFEUILLE, Js., concurred.

BORDEN, J., concurring. I fully join the well reasoned majority opinion. I write briefly only to underscore my view, expressed by the majority as well, that any challenge to a kidnapping conviction based on either the slightness of the degree of movement or the brevity of the length of time of the restraint, must be reserved for a constitutional claim of vagueness of the statute as applied.

I concede that where, as in the present case, the degree of movement of the victim, or the length of time she was forcibly restrained, may appear to be very slight, and where those same facts may form part of the elements of the conviction for attempted sexual assault in the first degree, it may seem counterintuitive to conclude that the evidence was nonetheless also sufficient for a conviction of kidnapping. It would be appealing to decide, as the dissent does, that in a given case the degree of movement or time of forcible restraint is too de minimus to constitute kidnapping. The fact that it may be counterintuitive to me, however, is not sufficient to disregard two well established doctrines in our criminal law jurisprudence, both of which the majority aptly articulates.

The first is that conviction for two or more distinct offenses is not precluded, as a matter of law, simply because the same facts constitute those offenses. *State v. Wilcox*, 254 Conn. 441, 465, 758 A.2d 824 (2000); *State v. Andrews*, 108 Conn. 209, 215, 142 A. 840 (1928). Thus, the fact that the defendant's conduct constituted both kidnapping and attempted sexual assault does not preclude a conviction for both. The second is that kidnapping does not require any particular minimum degree of movement or length of time of physical restraint. *State v. Wilcox*, supra, 465; *State v. Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977). Thus, the arguable slightness of the movement and brevity of the forcible restraint, on the facts of the present case, do not, in my view, preclude the kidnapping conviction on the basis of insufficiency of the evidence. In fact, we have implicitly rejected any notion that a slight degree of asportation or detention could create a jury question regarding whether a kidnapping was merely "incidental" to the underlying crime also committed by the defendant. *State v. Chetcuti*, supra, 170. It would be contrary to the legislative scheme for us to reenter that fray, and would amount to micromanaging what is essentially a charging decision by the state, as the state candidly conceded in oral argument before this court.

I would, therefore, confine any challenge based on these considerations to a claim that the kidnapping statute was unconstitutionally vague as applied to the facts of the particular case. Our case law suggests that such a challenge could be made in an appropriate case—again, as the majority points out. Such a challenge, however, would raise issues of a different dimension. A vagueness challenge on those grounds would require an inquiry into such questions as whether the statute gave fair notice to the defendant, and whether it permitted unconstitutionally unrestrained discretion

in enforcement of the criminal law. See, e.g., *State* v. *McMahon*, 257 Conn. 544, 552, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002); *State* v. *Ehlers*, 252 Conn. 579, 584, 750 A.2d 1079 (2000). Because the defendant has not raised such a challenge, either in the trial court or in this court, I would decline to consider the question.

I therefore join the majority opinion in full, and concur in its judgment.

KATZ, J., dissenting in part. As recited by the majority, this court has stated on many occasions that a defendant may be convicted of both kidnapping and attempted sexual assault. While I agree that a defendant *may* be convicted of both crimes, the conviction of the defendant of both crimes under the facts of this case renders an absurd result. Therefore, I respectfully dissent.

The jury reasonably could have found the following facts. On the night of April 21, 1998, and into the early morning hours of April 22, 1998, the defendant, Peter Luurtsema, and the victim were in the victim's apartment in Manchester. At one point during the evening, after they had engaged in consensual oral sex in the kitchen, one of the victim's neighbors came over to the victim's apartment and the defendant and the victim moved into the living room to visit with him. As noted by the majority, after the neighbor left, the defendant pulled the victim to the floor in the living room, removed her pants and underpants, forced her legs apart and choked her. The defendant then moved toward the bathroom, at which time the victim escaped. The defendant was arrested and ultimately found guilty of one count each of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and assault in the

second degree in violation of General Statutes § 53a-60 (a) (1).

In order to be convicted of kidnapping in the first degree pursuant to § 53a-92 (a) (2) (A), a defendant must abduct another person and restrain him or her with intent to inflict physical injury upon him or violate or abuse him sexually. " 'Abduct' means to restrain a person with intent to prevent his liberation by . . . using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2) (B). " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." General Statutes § 53a-91 (1). The sexual assault statute itself provides in relevant part that "[a] person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ." General Statutes § 53a-70 (a) (1).

When construing statutes, "[w]e presume that laws are enacted in view of existing relevant statutes . . . because the legislature is presumed to have created a consistent body of law. . . . We construe each sentence, clause or phrase to have a purpose behind it. . . . In addition, we presume that the legislature intends sensible results from the statutes it enacts. . . . Therefore, we read each statute in a manner that will not thwart its intended purpose or lead to absurd results." (Citations omitted; internal quotation marks omitted.) *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 728–29, 778 A.2d 899 (2001); accord *State* v. *Albert*, 252 Conn.

795, 807 n.15, 750 A.2d 1037 (2000) (construing criminal statute in manner to avoid bizarre result); *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994) (same).

A close reading of these statutes in the context of the present case reveals that the attempted sexual assault could not have been accomplished without "restraining" and "abducting" the victim, as those terms are defined in § 53a-91 (1) and (2) (B), respectively. To put it another way, kidnapping, according to the literal language of the statute, was *required* for the commission of the sexual assault under the state's theory of this case.[1] While kidnapping does not merge with sexual

---

[1] In his closing argument, the assistant state's attorney highlighted the evidence that he was relying on in support of each of the four charges against the defendant. In particular, with respect to the restraint element essential for the kidnapping charge, the assistant state's attorney relied solely upon the evidence that the defendant had dragged the victim and pinned her to the floor. The relevant portion of his closing argument was as follows:

"The second count is kidnapping in the first degree. And I am sure you all recall that I asked each and every one of you on voir dire do you understand that you're under an obligation to accept and apply the law that's given you by the judge whether you agree with it or not, and you said yes, you could. And I said, in [particular], that might include kidnapping; you might be surprised to hear what the crime of kidnapping consists of, would you still, would you nonetheless follow the judge's instructions, set aside your own preconceived notion of what perhaps kidnapping is, follow the law you receive from the judge; and you all said yes, I could do that.

"Well, you might . . . hear Judge Mulcahy talk about . . . a kidnapping in the first degree involving the abduction of somebody and restraining them with the intent to inflict physical injury upon them or violate or abuse them sexually.

"Substitute the words Miss C for them. Let me read it again. Abducting Miss C and restraining Miss C with the intent to inflict physical injury upon her or violate her or abuse her sexually.

"There's that word again: intent. And, basically, you are going to be told about intent tomorrow morning. How do you tell intent? Well, there's a couple different ways you can tell intent. Sometimes the person might mention what's on their mind. That might tell you what intent is. But often it's a matter of inference. You use your own common sense, your own logic, infer from their conduct what their intent was on a given occasion.

"*Abduct means to restrain with intent to prevent liberation by use of physical force. What is the testimony here that goes with that portion of*

assault; see *State* v. *Amarillo*, 198 Conn. 285, 305, 503 A.2d 146 (1986) ("defendant may be convicted of two crimes that derive from the same conduct 'as long as the state [is] able to prove, beyond a reasonable doubt, all of the essential elements of each crime' "); *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977) ("the legislature of this state has seen fit not to merge the offense of kidnapping with sexual assault or with any other felony"); and the statute does not impose a time duration for the restraint nor any distance requirement for the asportation element; *State* v. *Chetcuti*, supra, 170; this court has indicated that there may be "factual situations in which charging a defendant with kidnapping based upon the most minuscule movement would result in an absurd and unconscionable result . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 215 Conn. 173, 180, 575 A.2d 216 (1990). I would conclude that this is just such a case.

In *Jones*, the defendant grabbed the victim as she was jogging down a road in a park and dragged her off into the woods, where he assaulted her. Id., 175. In rejecting the defendant's claim that the definition of

---

*the kidnapping? Miss C's testimony. He dragged me to the floor. He pinned me to the floor. I couldn't move. I could only move when he got up to go to the bathroom, toward the bathroom.*

*"To restrain means to restrict Miss C's, in this particular case, restrict Miss C's movements intentionally and unlawfully in such a manner as to interfere substantially with her liberty by confining her in a place where the restriction commenced without her consent. She said she didn't consent to being on the floor. She was seated on the couch. She was dragged to the floor. She was pinned to the floor. She couldn't move.*

"Interestingly enough, you may very well hear from Judge Mulcahy tomorrow stating that the statute, the kidnapping statute, does not impose any time requirements for restraint, nor distance requirements for asportation to constitute the crime of kidnapping. In other words, we don't have a time clock going off to see how long somebody's restrained. We don't have a ruler to measure how far they're carried or dragged or moved.

*"She was on the couch. She was dragged to the floor and pinned there. I would submit to you, ladies and gentlemen, that that is a kidnapping in the first degree."* (Emphasis added.)

restrain in § 53a-91 (1) was unconstitutionally vague, this court concluded that grabbing and dragging the victim off the road and into the woods constituted moving the victim from one place to another pursuant to §§ 53a-91 (1) and 53a-92 (a) (2) (A). Id., 180. Thus, the movement of the victim was more than minuscule, and the result was not absurd or unconscionable.

Since *Jones*, this court has continued to acknowledge that there may be factual situations wherein a charge and conviction of kidnapping would render an absurd and unconscionable result. See *State* v. *Troupe*, 237 Conn. 284, 315, 677 A.2d 917 (1996); *State* v. *Tweedy*, 219 Conn. 489, 503, 594 A.2d 906 (1991). Neither of those cases, however, provided facts that would lead to such a result. In *Troupe*, the defendant, after repeated requests by the victim, refused to let her leave his apartment, both before and after he sexually assaulted her. *State* v. *Troupe*, supra, 315. In *Tweedy*, the defendant held the victim in her own apartment, and moved her to various rooms in her apartment before he sexually assaulted her. *State* v. *Tweedy*, supra, 503. In both *Troupe* and *Tweedy*, the defendants raised the claim that the provisions of the kidnapping statute were unconstitutionally vague.[2] We disagreed with the defendants because in each case there had been sufficient

---

[2] As the majority states in its opinion, the defendant in the present case does not raise the claim that § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to his case. Because his claim challenging the sufficiency of the evidence does, however, require this court to interpret the kidnapping statute in a manner that will not thwart its intended purpose or lead to absurd results, review of the statute as it applies to the facts of this case is appropriate. See *State* v. *Ehlers*, 252 Conn. 579, 592–96, 750 A.2d 1079 (2000) (considering whether interpretation of General Statutes § 53a-196d would lead to absurd result when reviewing defendant's claim of insufficient evidence for conviction of possession of child pornography); *State* v. *Solek*, 66 Conn. App. 72, 76–79, 783 A.2d 1123, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001) (considering whether interpretation of General Statutes § 53a-65 would lead to absurd result when reviewing defendant's claim of insufficient evidence for sexual assault conviction).

evidence to indicate that the defendant restrained or moved the victim in a manner that was more than miniscule. In *Troupe*, *Tweedy* and *Jones*, the restraint was not essential to the sexual assault; in other words, there was some evidence that the kidnapping was a discrete and distinct crime from the sexual assault. See also *State* v. *Wilcox*, 254 Conn. 441, 466, 758 A.2d 824 (2000) (defendant found to have "forcibly grabbed the victim's arm in order to prevent her from exiting [his] vehicle," and proceeded to drive victim out to woods to sexually assault her); *State* v. *Briggs*, 179 Conn. 328, 330, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980) (defendant got into victim's car, drove several miles to wooded area and sexually assaulted her). Thus, even when this court has held that a defendant may be convicted of kidnapping when it is " 'integral or incidental' to the crime of rape"; *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983); the court was not presented with a factual scenario in which the movement or confinement of the victim was such that a conviction for kidnapping, in addition to sexual assault, would render an absurd or unconscionable result. See id., 606 (defendant took victim at knifepoint to back room of convenience store, where he sexually assaulted her).

In the present case, however, we are presented with a factual scenario that readily is distinguishable from the cases previously cited herein. The defendant was convicted of kidnapping either for confining the victim "where the restriction commence[d]," without which confinement the sexual assault that was attempted by the defendant physically could not be accomplished, or for pulling the victim from the sofa to the floor. Accordingly, I believe the evidence of the movement and confinement in this case falls into the realm of the "miniscule movement" admonition of *Jones*, resulting

in an absurd and unconscionable result.[3] See *State* v.

<hr/>

[3] Although there was evidence that the defendant choked the victim, and the jury *could* have looked to that evidence in connection with the kidnapping charge, notably, in his closing argument the assistant state's attorney did not mention the choking in connection with the requisite restraint of the victim by movement or confinement. See footnote 1 of this opinion citing the assistant state's attorney's closing argument with respect to the kidnapping charge. Rather, that evidence was relied upon by the assistant state's attorney in support of the charges of attempted sexual assault in the first degree, attempted murder and assault in the second degree. The relevant portion of the state's closing argument regarding those three charges was as follows:

"Now, what was the evidence you heard about an attempted sexual assault in the first degree? First of all, what were the substantial steps taken here? First, Miss C testified that the defendant, when the two were seated on the couch in her living room, dragged her to the floor in her living room; second that he pinned her to the floor; third, that he got on top of her or over her; fourth, that he disrobed her from the waist down, taking off her pants and her panties; fifth, that he spread her legs wide by the ankles and spread her legs so violently that Miss C complained of pain and she was afraid for a while that there was ligament damage or that perhaps, perhaps even her legs might have been broken; sixth, Miss C struggled; seventh, the defendant, according to Miss C, choked Miss C.

"Was the purpose in the choking to overcome Miss C's resistance? What does the phrase plan to culminate in the commission of the crime of sexual assault in the first degree mean? Well, as a layperson, as a juror, as a fact finder, what you're met with is to look at the defendant's conduct. Why else does a man throw a woman on the floor, pin her on the floor, take off her pants and underpants, spread her legs, struggle with her, and then choke her, if not to sexually assault?

"You are going to hear the definition of sexual assault, so that it might aid you in determining whether or not I met my burden on the attempted sexual assault in the first degree. In a nutshell, you might hear something like this from Judge Mulcahy: that sexual assault in the first degree involves compelling another person to engage in sexual intercourse. Sexual intercourse may include either vaginal intercourse or oral intercourse, cunnilingus; that is, the male performing oral sex on the female, and—in this particular case—by the use of force. By the use of force.

"What force did we have here? Dragging her to the floor, pinning her to the floor so she couldn't move, and ultimately, taking off her pants and her panties and choking her.

\* \* \*

"The crime of attempted murder. The information indicates that [the defendant], acting with the intent to cause the death of Miss C, intentionally did anything which under the circumstances as he believed them to be was an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of murder by choking and stran-

*Jones,* supra, 215 Conn. 180. I would therefore conclude that the defendant's conviction for kidnapping in the first degree must be reversed.

Accordingly, I respectfully dissent.

gling Miss C.

"So, again, you're going to grapple with, or you are going to have to consider, I should say, was there an intent to cause death. In other words, was his plan to culminate in the commission of [Miss] C's murder, that is, intending to cause her death, causes her death.

"Again, it's regarding the choking, the strangling. Interestingly enough, we have the testimony of Miss C. What was going on in her mind? She's concentrating on breathing. She couldn't breathe. She thought she would die. Attempted murder. She thought she would die.

\* \* \*

"Assault in the second degree is the fourth and final count. And that involves intending to cause serious physical injury, you cause serious physical injury. Serious physical injury is defined as physical injury which causes a substantial risk of death for purposes of this statute.

"Remember [Arkady Katsnelson, a medical examiner for the state] yesterday testifying that a strangulation, manual strangulation, strangulation of the neck by the hands gives rise to a substantial risk of death? Because all it takes is thirty seconds of squeezing the carotid arteries to shut off the oxygenated blood supply to the brain and you die. You expire.

"What is physical injury defined as in the law? You will hear something like this: that physical injury means the impairment of physical condition or pain. You can certainly reasonably and logically infer from Miss C's testimony she was in pain when she was on the floor being choked. It hurt. Besides which, she's struggling to breathe. She's concentrating on breathing. She thought she would die. Isn't that an impairment of physical health, which is one of the definitions of physical injury?"