******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARVIN KITCHENS *v.* COMMISSIONER
OF CORRECTION
(AC 37390)

Beach, Sheldon and Mullins, Js.

*Argued April 7—officially released August 30, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Mary Boehlert*, assigned counsel, for the appellant
(petitioner).

*Laurie N. Feldman*, special deputy assistant state's
attorney, with whom, on the brief, were *Gail P. Hardy*,

state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Marvin Kitchens, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus, in which he challenged the conviction rendered against him after a jury trial, on charges of kidnapping in the second degree in violation of General Statutes § 53a-94 (a)[1] and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a),[2] on the ground of ineffective assistance of counsel. He claims, more particularly, that the habeas court erred in ruling that his trial counsel did not render ineffective assistance by failing to request proper jury instructions on two essential elements of the charged offenses and/or failing to object or except to the trial court's omission of such proper jury instructions from the court's charge. First, he claims that the jury should have been instructed, pursuant to *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), that the offense of kidnapping requires proof that he intended to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit another crime against the victim. Second, he claims that the jury should have been instructed, as part of the common element of restraint required for commission of the offenses of unlawful restraint and kidnapping, that he acted with a specific intent to interfere substantially with the victim's liberty rather than merely a general intent to engage in conduct that caused that result.

The respondent, the Commissioner of Correction, argues that the habeas court properly concluded that the petitioner failed to establish ineffective assistance as to either challenged aspect of his trial counsel's representation. We agree with the respondent, and thus affirm the judgment of the habeas court.

The following facts, as set forth by our Supreme Court in its decision affirming the petitioner's underlying criminal conviction on direct appeal, are relevant to this appeal. "On the night of April 19, 2007, the victim, Jennaha Ward, was playing cards with her godfather, Ronald Sears, at Sears' second story apartment in the city of Hartford. While playing cards, the victim and Sears decided to eat, and Sears went out and purchased shrimp for them to fry. The victim then prepared the shrimp while Sears heated cooking oil in a cast iron skillet. While they were eating the shrimp, the [petitioner] called Sears' cell phone looking for the victim, with whom the [petitioner] had been in a five month extramarital relationship that the victim recently had ended. The [petitioner] told the victim that he was around the corner from Sears' apartment and asked whether she would come down and talk to him, and the victim said that she would. The victim, however, did not intend to speak to the [petitioner]. Rather, she went downstairs to lock the door to make sure that he

could not get inside. When the victim reached the first floor landing, she jumped up to look out the window above the door to see whether the [petitioner] had arrived yet. As soon as she landed back on her feet, he burst through the door, grabbed her by her clothing and pulled her outside. After the [petitioner] heard a woman say that she was calling the police, he again grabbed the victim by her clothing and dragged her back inside and upstairs to Sears' apartment.

"Once upstairs in the apartment, the [petitioner] asked the victim why she had ended their relationship and physically blocked her from leaving the apartment when she tried to run out the door. Following the altercation that ensued between the [petitioner] and the victim, during which Sears asked them to take their dispute outside, she sustained first and second degree burns to her face after her head made contact with the skillet containing the frying oil. The [petitioner] then fled the apartment, at which time Sears called for the police and emergency assistance. The victim received treatment for her facial burns at Saint Francis Hospital and Medical Center, and the Burn Center at Bridgeport Hospital.

"After a police investigation, the [petitioner] was arrested, and the state charged him in a five count information with assault in the first degree in violation of General Statutes § 53a-59 (a) (1), attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (2) and 53a-49 (a) (2), burglary in the second degree in violation of General Statutes (Rev. to 2007) § 53a-102 (a) (1), kidnapping in the second degree in violation of § 53a-94 (a), and unlawful restraint in the first degree in violation of § 53a-95 (a). Following a jury trial and the trial court's denial of defense counsel's oral motion for judgment of acquittal, the jury returned a verdict of not guilty on the assault, attempted assault and burglary charges, but guilty on the kidnapping and unlawful restraint charges. The trial court then rendered judgment of conviction in accordance with the jury's verdict and sentenced the [petitioner] to a total effective sentence of twelve years imprisonment, execution suspended after eight years, and five years probation." (Footnotes omitted.) *State* v. *Kitchens*, 299 Conn. 447, 450–52, 10 A.3d 942 (2011).

"The case was tried in late February and early March of 2008, four months prior to the July 1, 2008 release of our decision in *State* v. *Salamon*, supra, 287 Conn. 509. The trial court's instruction on kidnapping in the second degree did not direct the jury to consider whether the restraint imposed exceeded that necessary or incidental to the underlying assault crimes.[3] Further, the defense did not file a request to charge the jury, or take an exception to the instructions as given, to that effect." (Footnote altered.) Id., 453–54.

"On February 25, 2008, the state filed a request to

charge containing five suggested changes to the instructions on assault and burglary. The following day, when the trial court noted on the record that defense counsel had stated in chambers that he did not intend to file a request to charge and asked if that was still the case, counsel replied that it was. Two days later, the court held an on-the-record charge conference in which it referred to a proposed charge it previously had given to the parties. After a brief discussion with the assistant state's attorney (prosecutor) concerning the assault instruction, the court asked defense counsel if there was anything he wanted to discuss. Counsel indicated that he would like to discuss the prosecutor's request to charge, which the court proceeded to consider. Defense counsel agreed that the proposed language fairly stated the law and indicated that he either had no objection or preferred the standard charge. At one point, defense counsel asked that the court use less 'pejorative' language in its instruction on the [petitioner]'s decision not to testify, and the court agreed to do so. At the conclusion of the conference, the court asked the attorneys, '[a]nything else about the charge . . . ?' Defense counsel replied, '[n]o, Your Honor. I don't think so.' After addressing certain other matters, the court advised that both attorneys should refrain from defining legal terms in their summations and should limit their arguments to the facts that would satisfy the elements of the charged crimes. Both parties agreed, with defense counsel responding, '[f]air enough.'

"Several days later, the court informed the parties in an on-the-record conference that it had completed the jury instructions and that each attorney should obtain a copy for discussion at a future meeting. The prosecutor responded that he had stopped by the courthouse the previous day, had read the completed instructions and was ready to make some suggestions, none of which related to the kidnapping or unlawful restraint counts, but that he did not know if defense counsel had done the same. The court replied that, if the prosecutor had any suggestions, it wanted to hear them at that time. Reading from his copy of the instructions, the prosecutor remarked on a typographical error and suggested one other minor correction to the instruction on credibility. At the conclusion of the discussion, the court turned to defense counsel and asked if he also had been able to examine the instructions, to which counsel replied, '[a]ctually, Your Honor, my copy is downstairs, but I didn't have any major revisions.' The court then concluded: 'All right. So then we don't have to get together. We're done. Okay.' Neither party said anything further on the matter, and the court adjourned.

"Thereafter, the parties made their closing arguments, and the court instructed the jury. The court first instructed on the element of intent under count one— first degree assault—that, '[a]s defined by our statute, a person acts intentionally with respect to a result or

to conduct when his conscious objective is to cause such result or to engage in such conduct.' For each substantive offense thereafter, the court repeated the preceding instruction on intent or stated as follows: 'You will recall the instructions on intent that I gave you, when I explained count one and apply them here also.' Upon completion of the instructions, the prosecutor stated that he had no exceptions. Defense counsel volunteered that he also had no exceptions. Neither party made any other comments and jury deliberations followed." (Footnote omitted.) Id., 463–65.

In addition, the court defined "restrain" when describing the elements of kidnapping in the second degree and unlawful restraint in the first degree, as to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty.

On August 9, 2013, the petitioner filed an amended petition for a writ of habeas corpus, claiming, inter alia, that his trial attorney's failure to request a charge pursuant to *Salamon*, or on specific intent and failure to take exception to the charge as given, fell below the standard of reasonable competence.[4]

The petitioner's habeas trial was held on November 18, 2013, before Judge Cobb. The petitioner's public defender, Bruce Lorenzen, testified that he had graduated from law school in 1984. He worked as a public defender for ten years in New York before coming to Connecticut, where he has been a public defender since 1999. Lorenzen's defense theory in the petitioner's case was that the victim was obsessed with the petitioner and upset that he had ended their relationship. Consistent with that theory, Lorenzen argued that the victim had summoned the petitioner to Sears' apartment, where, during a mutual physical altercation between them, a pot of oil had splashed on her. In support of that theory, Lorenzen attacked the credibility of the victim, claiming, in particular, that the victim's story that the petitioner had pushed in the front door of Sears' apartment building and forced her upstairs was not plausible because the front door to the building was self-locking.

Lorenzen recalled in his testimony that a charge conference had been held off the record, and was later memorialized on the record. He recalled the instructions on intent as being the "standard pattern instructions . . . ." He testified that he had not regarded use of the standard instructions as a problem, nor had he "any particularly strong concerns" about them in this case, "given the . . . theory of defense and the state of the law at the time that the case was tried." Lorenzen additionally testified that, although he was aware that, contemporaneously with the petitioner's trial, an argument was being made on appeal in *Salamon* that the proof requirements for kidnapping should be changed,

he did not make that argument in his case because it was inconsistent with his theory of defense. He explained, "If you consider where *Salamon* got us to, in this case, potentially the jury would understand a *Salamon*-like instruction as—if you think he did the assault, the kidnapping should be considered separately and require more proof than just proof of the assault. And the theory of defense was that [the petitioner] hadn't done anything wrong, so, essentially, like the decision on whether or not to request a lesser included offense, frequently, you wouldn't request a lesser included if your theory was that your client hadn't done anything wrong at all." In fact, Lorenzen said, he would not have requested a *Salamon* instruction even if *Salamon* had been decided prior to the petitioner's trial.

As for an instruction on specific intent, Lorenzen testified that he did not consider intent to be "an issue of any real moment in the case" because the issue in the case "was not . . . that . . . [the petitioner] had done something wrong and what did he have in his head when he did it, it was more about whether he had done anything wrong at all . . . ."

On September 17, 2014, the habeas court issued its memorandum of decision denying the petition for a writ of habeas corpus. The court concluded that Lorenzen's failure to request a *Salamon* instruction was not deficient performance, explaining its decision as follows. "This claim fails because *State* v. *Salamon*, supra, 287 Conn. 509, represented a significant change in the law of kidnapping and was not decided until several months after the petitioner's trial.

"At the time of the petitioner's trial, the law related to kidnapping and other crimes was governed by *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977), and *State* v. *Luurtsema*, 262 Conn. 179, 200–204, 811 A.2d 223 (2002), overruled in part by *State* v. *Salamon*, 287 Conn. 509, 513–14, 949 A.2d 1092 (2008). Under these cases, a person could be convicted of kidnapping if he restrained another person with the intention to prevent their liberation even if the restraint was incidental to the commission of another offense. . . . In *State* v. *Salamon*, supra, 287 Conn. 509, the Supreme Court reversed this precedent and held for the first time that 'to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period or to a greater degree than that which is necessary to commit the other crime.' Id., 542. In other words, the court held that there can be no kidnapping under Connecticut law if the restraint is merely incidental to another crime. Id.

"The trial in this case occurred in February and early March, 2008. The Supreme Court issued its decision in *State* v. *Salamon*, supra, 287 Conn. 509, on July 1, 2008, approximately three months later. Thus, at the time of the trial in this case the law of kidnapping was governed

by *State* v. *Luurtsema*, supra, 262 Conn. 200–204. Had trial counsel sought an instruction similar to that later approved in *Salamon*, it would have been rejected by the trial court as contrary to binding precedent of the Supreme Court. See *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 855, 97 A.3d 986 (2014) ('[I]n light of our Supreme Court's affirmation and reaffirmation of its holding in *Chetcuti*, there was no reasonable basis for counsel to have asked the court in the petitioner's criminal trial for an instruction not then permitted and, indeed, expressly rejected by then controlling decisional law. Moreover, given the pre-*Salamon* status of the judicial gloss on the kidnapping statute, there was good reason, based on professionalism, for counsel not to have sought a *Salamon* instruction at trial and to have challenged on appeal the absence of such a charge.').''

In addition, the habeas court found that the petitioner had not been prejudiced by the lack of a *Salamon* instruction. "The court notes that in the direct appeal of the petitioner's conviction, the Supreme Court determined that the acquittal on the underlying assault charges rendered the lack of a *Salamon* instruction harmless error. *State* v. *Kitchens*, supra, 299 Conn. 453. For the same reason, the petitioner has not proved that he was prejudiced by the failure of the trial court to give the instruction in this case."

As for counsel's alleged failure to seek a proper instruction on specific intent, the habeas court also rejected this claim, stating, "This court agrees with Justice Katz' concurring opinion in *State* v. *Kitchens*, supra, 299 Conn. 529–30, that although the trial court's charge may have improperly included both specific and general intent, reading the instructions as a whole, the charge adequately presented the elements of the charges, and it was not reasonably possible that the jury was misled.

"Moreover, the court finds that it was objectively reasonable for trial counsel to have determined that the instruction was appropriate under the circumstances. Accordingly, the petitioner has failed to establish a deficiency by trial counsel."

The petitioner claims that the habeas court erred in finding that his counsel's failure to request *Salamon* and specific intent instructions and failure to object to the instructions as given did not constitute deficient performance.

"In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to pre-

vail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense [by establishing a reasonable probability that, but for the counsel's mistakes, the result of the proceeding would have been different]. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Furthermore, [i]n a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Farnum* v. *Commissioner of Correction*, 118 Conn. App. 670, 674–75, 984 A.2d 1126 (2009), cert. denied, 295 Conn. 905, 989 A.2d 119 (2010).

I

The petitioner first claims that the habeas court erred in not finding trial counsel's failure to request an instruction consistent with the new interpretation of kidnapping announced in *Salamon* constituted ineffective assistance of counsel. The petitioner acknowledges that *Salamon* was not decided until after his trial, but argues that, because Lorenzen was aware that the law was in flux at the time of his trial, he should have made an argument that was contrary to the law at the time.

The decision in *Salamon* was not issued until after the petitioner's trial. Accordingly, as the habeas court noted, Lorenzen's failure to request an instruction requiring the jury to find that the petitioner intended to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit another crime was consistent with existing law at the time of trial. Lorenzen was not required to advance a "speculative theory." See *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 461, 880 A.2d 160 (2005) ("counsel's failure to advance novel legal theories or arguments does not constitute ineffective performance"), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). This is especially true because, as Lorenzen testified, the speculative theory urged by the petitioner would have been inconsistent with the defense theory of the case.

Accordingly, the petitioner cannot establish that his counsel's performance was deficient, and the habeas court did not err in denying his petition on that ground.

II

The petitioner next claims that the habeas court erred in finding that Lorenzen's failure to ensure that the jury was instructed only on specific intent did not constitute

ineffective assistance of counsel.

In *State* v. *Salamon*, supra, 287 Conn. 569–71, the defendant claimed that the jury also was improperly instructed on the intent required for the offense of unlawful restraint. More specifically, the defendant claimed that the jury instructions effectively eliminated the specific intent element, and only instructed the jury that "a person acts intentionally with respect to [a] result or conduct when the conscious objective is to engage in such conduct." (Internal quotation marks omitted.) Id., 570. Later, the court instructed the jury that "[r]estraint, as we just discussed, means to restrict a person's movements intentionally and unlawfully in such a manner so as to substantially interfere with her liberty by confining her without her consent." (Internal quotation marks omitted.) Id., 571. Our Supreme Court concluded that the jury instructions were not misleading, reasoning as follows: "The state concedes that the trial court's definition of intent was incomplete because the court failed to explain the term in accordance with the statutory definition. Because the court's definition of intent did not contain the phrase to cause such result, that definition focused solely on the concept of general intent—that is, an intent to engage in certain conduct—and not on the concept of specific intent—that is, an intent to bring about a certain result. When the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent. . . . Because, as we have explained, unlawful restraint is a specific intent crime, the court's definition of intent, standing alone, was inaccurate for purposes of the present case. . . .

"[W]e conclude that it is not reasonably possible that the jury was misled by the court's incomplete definition of intent because the court thereafter accurately explained that, to prove the element of restraint, the state was required to establish that the defendant had restricted the victim's movements *intentionally and unlawfully* in such a manner so as to interfere substantially with her liberty by confining her without her consent. . . . Under this explanation, there is no reasonable possibility that the jury could have found the defendant guilty of unlawful restraint unless it first had found that he had restricted the victim's movements with the intent to interfere substantially with her liberty. In other words, because restraint is itself defined in terms that include the requirement of a specific intent, and because the trial court properly instructed the jury on that definition, the defendant was not prejudiced by

the trial court's failure to define intent in full compliance with [General Statutes] § 53a-3 (11)."[5] (Citation omitted; emphasis in original; footnote added; internal quotation marks omitted.) Id., 572–74.

Here, we also conclude that the petitioner's jury could not have been misled by the instructions provided. Justice Katz, in her concurrence in the petitioner's direct appeal, came to the same conclusion when she determined that the instruction given on intent did not constitute a constitutional violation under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third condition of *Golding* test). She also relied on *Salamon*, reasoning as follows: "As the state properly concedes in the present case, the trial court's definition of intent incorrectly encompassed both specific and general intent. See *State* v. *Francis*, 246 Conn. 339, 358, 717 A.2d 696 (1998) (although generally it is improper for trial court to provide entire statutory definition of intent when charge required specific intent, no error in context of particular case when jury not misled); *State* v. *Youngs*, 97 Conn. App. 348, 361, 904 A.2d 1240 (same), cert. denied, 280 Conn. 930, 909 A.2d 959 (2006). Therefore, as in *Salamon*, the question is whether it was reasonably possible that the jury relied on the general intent instruction to convict the [petitioner] of a specific intent crime. Reading the jury instructions as a whole, I conclude that it was not reasonably possible that the jury was misled. In the present case, the trial court twice provided the exact same definition of restraint as was provided by the trial court in *Salamon*, which explicitly required the jury to find that the [petitioner] had restricted the victim's movements with the intent to interfere substantially with her liberty. Therefore, I conclude that the trial court's instructions adequately presented the elements of the charges of kidnapping in the second degree and unlawful restraint in the first degree to the jury. Therefore, the [petitioner] has failed to establish that there was a constitutional violation." *State* v. *Kitchens*, supra, 299 Conn. 528–30 (*Katz, J.*, concurring).

We agree with Justice Katz that the instruction in this case that the petitioner must have restricted the victim's movements with the intent to interfere substantially with her liberty "adequately presented the elements of the charges of kidnapping in the second degree and unlawful restraint in the first degree to the jury." Id., 530; see also *State* v. *Salamon*, supra, 287 Conn. 573. As Judge Cobb appropriately concluded, it was not reasonably possible that the petitioner's jury was misled. Therefore, the petitioner has not met his burden of "establishing a reasonable probability that, but for [his] counsel's mistakes, the result of the proceeding would have been different," as required to establish the second prong of *Strickland. Farnum* v. *Commissioner of Correction*, supra, 118 Conn. App. 675.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he *abducts* another person." (Emphasis added.)

General Statutes § 53a-91 (2) provides: " 'Abduct' means to *restrain* a person with *intent* to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." (Emphasis added.)

General Statutes § 53a-91 (1) provides in relevant part: " 'Restrain' means to restrict a person's movements *intentionally* and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ." (Emphasis added.)

[2] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he *restrains* another person under circumstances which expose such other person to a substantial risk of physical injury." (Emphasis added.)

General Statutes § 53a-91 (1) provides in relevant part: " 'Restrain' means to restrict a person's movements *intentionally* and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ." (Emphasis added.)

[3] "We note that the trial court instructed the jury in relevant part: 'The [petitioner] is charged in count four with the crime of kidnapping in the second degree, in violation of [§] 53a-94 of the Penal Code, which provides, as it pertains to this case, as follows: A person is guilty of kidnapping in the second degree when he abducts another person.

'The elements of the crime: For you to find the [petitioner] guilty of this charge, the state must prove beyond a reasonable doubt that the [petitioner] abducted the victim. "Abduct" means, as it pertains to this case, to restrain a person with intent to prevent his liberation by using or threatening the use of physical force or intimidation. The term "restrain" means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent. As used here, "without consent" means but is not limited to any means whatsoever. You will recall my earlier instructions on intent and apply them here also.

'Now, the state contends in count four that, on or about April 19, 2007, in the late evening, at 15 Martin Street, Hartford, Connecticut, the [petitioner] . . . abducted [the victim]. The [petitioner], on the other hand, denies all of the state's allegations. If you unanimously find in count four that the state has failed to satisfy you beyond a reasonable doubt as to any of the necessary elements, which I have explained to you, you must find the [petitioner] not guilty. On the other hand, if the state has satisfied you beyond a reasonable doubt of the existence of each of these essential elements, your verdict should be guilty of the [offense] as charged on this count.' " *State* v. *Kitchens*, supra, 299 Conn. 453–54 n.9.

[4] The petitioner also claimed that his due process right to a fair trial and right to redress of grievances were violated. Finally, the petitioner claimed that the decision in *Kitchens* violated the nonretroactivity doctrine of *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). The habeas court denied these claims. The petitioner appeals only from the denial of his ineffective assistance of counsel claims.

[5] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."